Filed 1/12/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                   )
                                              )
      Plaintiff and Respondent,       )
                                              )        S181611
      v.                              )
                                              )      Ct.App. 4/3 G040151
SAMUEL MOSES NELSON,                          )
                                              )      Orange County
      Defendant and Appellant.        )  Super. Ct. No. 04ZF0072
_____)

        The 15-year-old defendant in this case was tried as an adult and convicted of the murder of 72-year-old Jane Thompson, and of five first degree burglaries relating to the residences of Thompson and two other women. The evidence featured defendant's confessional statements to sheriff's investigators during a custodial interrogation. The investigators had apprised defendant of his right to remain silent and right to have the assistance of counsel pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*),[1] and it is undisputed that defendant made a knowing, intelligent, and voluntary waiver of those rights at the outset of the interrogation. The question is whether defendant made a postwaiver invocation of

_____

[1]    The right to counsel for purposes of custodial interrogation implicates the Fifth Amendment privilege against self-incrimination, and must be distinguished from the Sixth Amendment right to counsel, which attaches upon the initiation of formal criminal proceedings. (U.S. Const., 5th & 6th Amends.; see *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1123 (*Gonzalez*) [discussing *McNeil v. Wisconsin* (1991) 501 U.S. 171, 177-178].)

his *Miranda* rights by asking several times to speak to his mother or by making certain other statements while being questioned. If he did, then the investigators' failure to stop the interrogation compelled suppression of the statements he made after the invocation.

In *Davis v. United States* (1994) 512 U.S. 452 (*Davis*), the United States Supreme Court held that once a suspect has waived his *Miranda* rights, any subsequent assertion of the right to counsel must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis*, at p. 459.) This standard likewise applies to assertions of the right to remain silent. (*Berghuis v. Thompkins* (2010) 560 U.S. __, __ [130 S.Ct. 2250, 2260].)

We hold that juveniles claiming a postwaiver invocation of their *Miranda* rights are properly subject to the *Davis* standard. Applying that standard, we conclude the trial court did not err in finding that defendant's requests to speak to his mother and other statements were not sufficiently clear to require cessation of the interrogation. Accordingly, defendant's confessional statements were properly admitted at trial, and the contrary judgment of the Court of Appeal must be reversed.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant Samuel Moses Nelson turned 15 years old in April 2004. Later that month, he burglarized Katherine Parks's home and took two purses. In May 2004, he burglarized Sheryl Adler's home and took two wallets and a checkbook. On June 18, 2004, defendant burglarized the home of his 72-year-old neighbor, Jane Thompson, taking a credit card. On June 26, 2004, Thompson was found dead in her home. The cause of death was massive blunt-force head trauma, with multiple skull fractures and brain hemorrhaging.

2

On June 28, 2004, investigators Daniel Salcedo and Brian Sutton of the Orange County Sheriff's Department spoke with defendant outside his home. Defendant claimed he had no idea who might have killed Thompson, and said he was willing to take a lie detector test.

After further investigation, Salcedo and Sutton returned to defendant's home on June 29, 2004. Defendant agreed to discuss the case with them, and was driven to the sheriff's office in Santa Ana. In a videotaped interview, the investigators asked some preliminary questions and then advised defendant of his right to counsel and right to remain silent under *Miranda*, *supra*, 384 U.S. 436. Defendant affirmed that he understood his rights and expressed a willingness to speak with the investigators.

During the interview, defendant admitted entering Thompson's house and taking some jewelry, her credit card, and her purse. Despite these admissions, he denied responsibility for Thompson's murder. About three and a half hours into the session, the investigators asked defendant if he wanted to take a polygraph test, and defendant asked to call his mother. When the investigators asked the reason for the call, he said he wanted to "let her know what's happening" and also to "talk to her about it" and "see what I should do." The investigators continued with their questions, which defendant answered. As the interrogation progressed and defendant became aware of the evidence against him, he changed his story several times and ultimately confessed to the burglaries of the Parks and Adler residences. He also made additional requests to call his mother and was permitted several times to try to reach her. Although he was unable to contact his mother, he did call and speak to his grandmother and brother. At one point defendant indicated he wanted the investigators to leave him alone because, in his words, they were "getting on me for something I didn't do." At other points defendant declined to take a polygraph test, because his relatives had told him in a telephone call that

3

they did not want him to "take the test" or "do anything" until a lawyer or his mother got there.

Finally, toward the end of the interview, defendant asked to have "a few minutes to myself" and answered affirmatively when investigators offered him a pencil and paper to write down his feelings. The investigators left the room after telling defendant this was his chance to explain what happened and to "[d]o the right thing." On their way out, they again allowed defendant to telephone his mother and brother. When the investigators returned, defendant said he had not written anything and asked, "Do you think I could be alone until my family gets here? They should be here in like 10 minutes?" The investigators told defendant they were "real tired" of his playing games, reiterated he should take this opportunity to say what happened in his own words, and left once more. Defendant then wrote out a statement and later explained that he entered Thompson's house in the middle of the night as she dozed on her living room sofa, and that he used his hammer to strike her head repeatedly when she suddenly stirred.[2]

---

[2]	The investigators asked defendant to sign and date his written statement, which he did. Then defendant read his statement aloud as follows. "I went into her house to take some stuff for, I really needed money for Colorado. I, I walked by her and she woke up. I freaked out and I hit her in her in the head several times. I didn't think she was dead though but she was on the ground snoring after I hit her. I didn't know what to do so I ran out of the house and went home. I didn't go back after that. I feel so bad about what I did it's indescribable. The hardest part was keeping it, keeping it a secret and, uh, trying to act normal. I'm very sorry to everyone for what I've done and I don't expect forgiveness from anyone, at least not for a while, a long time. I think there's something wrong with me and I would like some help. That's it." After reading this statement aloud, defendant made a more detailed confession in a second interview.

4

Defendant was charged with two counts of first degree burglary relating to the Parks and Adler residences, another three counts of first degree burglary relating to Thompson's residence, and one count of murder. It was also alleged that he personally used a dangerous and deadly weapon and that his crimes against Thompson involved a vulnerable victim.

Defendant filed a motion in limine to exclude his custodial confessions from trial. Specifically, he contended that investigators Salcedo and Sutton violated his Fifth Amendment rights by continuing to interrogate him despite his various requests to speak with his mother and requests to be alone. After the trial court denied this motion, defendant waived his right to a jury and submitted to a bench trial. The court found him guilty as charged.

The Court of Appeal affirmed in part but reversed the convictions relating to the murder and the Parks and Adler burglaries. Based on defendant's age, experience, maturity, sophistication, and the length, intensity, and content of the interrogation, a majority of the court concluded that defendant's purpose in making his first request to speak with his mother was to secure her assistance in protecting his Fifth Amendment rights. Accordingly, it held, any and all statements made after that request were obtained in violation of *Miranda*, *supra*, 384 U.S. 436, and inadmissible. Conversely, the dissenting justice would have upheld the admissibility of the confessional statements, because from the perspective of a reasonable officer, defendant did not unambiguously and unequivocally assert his *Miranda* rights. We granted the People's petition for review.

## DISCUSSION

Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1163-1164 (*Lessie*).) Before

addressing whether defendant invoked his *Miranda* rights by asking to speak with his mother, we explain why the investigators' questioning of defendant up to that point satisfied those standards.

"Under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment, '[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .' (U.S. Const., 5th Amend.) 'In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights' to remain silent and to have the assistance of counsel. (*Miranda*, at p. 467.) '[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citation], at least during the prosecution's case-in-chief [citations]." (*Lessie, supra,* 47 Cal.4th at p. 1162.) "Critically, however, a suspect can waive these rights." (*Maryland v. Shatzer* (2010) 559 U.S. __, __ [130 S.Ct. 1213, 1219].) To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. (*People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*); see *Lessie,* at p. 1169.)

Determining the validity of a *Miranda* rights waiver requires "an evaluation of the defendant's state of mind" (*Williams, supra,* 49 Cal.4th at p. 428) and "inquiry into all the circumstances surrounding the interrogation" (*Fare v. Michael C.* (1979) 442 U.S. 707, 725 (*Fare*)). When a juvenile's waiver is at issue, consideration must be given to factors such as "the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (*Ibid.* [juvenile's request

6

for his probation officer was not a per se invocation of his *Miranda* rights, and totality of the circumstances supported finding of a voluntary and knowing waiver]; *Lessie*, *supra*, 47 Cal.4th at pp. 1169-1170 [no connection between criminally experienced 16-year-old suspect's decision to waive rights and his request to speak with his father before answering questions].)

Here, the trial court determined that defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. The Court of Appeal agreed, noting the following circumstances: "At the time of his interview, Nelson was 15 years old. He had two prior arrests, the most recent resulting in a several month stay in juvenile hall. Before Nelson was questioned, the detective advised him they needed to go through the 'formality' of a *Miranda* right advisement. Nelson agreed he had heard the warning before and specifically told the detective he understood he had the right to remain silent. Nelson said he understood he could stop the detective at any time if he did not understand what rights he was waiving. His voluntary responses to the deputies' subsequent questions indicate he understood his *Miranda* rights and waived them."

The record fully supports this determination, and defendant concedes the validity of his waiver. Although he "did not expressly waive his *Miranda* rights, he did so implicitly by willingly answering questions after acknowledging that he understood those rights." (*Lessie*, *supra*, 47 Cal.4th at p. 1169.) Moreover, the investigators' failure to seek additional consent from a parent did not invalidate defendant's waiver. (*People v. Lara* (1967) 67 Cal.2d 365, 378-379; *In re Bonnie H.* (1997) 56 Cal.App.4th 563, 577.) Accordingly, there is no dispute that defendant was properly questioned during the first part of the interview.

We now turn to the issue at hand: Were the investigators required to halt their questioning when, three and a half hours into the session, defendant first asked to speak to his mother, and thereafter repeated that request several times and

7

made references to a lawyer and to being left alone?  As we shall explain, we find the analysis in *Davis*, *supra*, 512 U.S. 452, controlling.

### A.  The *Davis* Standard Governing Postwaiver Invocations of Rights Under *Miranda*

In *Davis*, *supra*, 512 U.S. 452, the United States Supreme Court meticulously addressed the principles applicable to an adult suspect's postwaiver invocation of *Miranda* rights during a custodial interrogation.  Although law enforcement officers are free to question a suspect who knowingly, intelligently, and voluntarily waives his rights under *Miranda*, "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." (*Davis*, at p. 458 [relying on *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485].) The prohibition against further questioning in these circumstances is not a constitutional requirement, but rather a prophylactic rule " 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " (*Davis*, at p. 458 [quoting *Michigan v. Harvey* (1990) 494 U.S. 344, 350].)

Whereas the question whether a waiver is knowing, intelligent, and voluntary calls for an evaluation of the suspect's state of mind, the same cannot be said for determining whether a suspect's postwaiver statement requires the immediate cessation of police questioning.  (*Williams*, *supra*, 49 Cal.4th at p. 428.) *Davis* could not make this more plain:  "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. [Citation.]  Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' [Citation.]" (*Davis*, *supra*, 512 U.S. at pp. 458-459.)

Under the *Davis* standard, it is not enough that a suspect makes a reference to an attorney "that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." (*Davis*, *supra*, 512 U.S. at p. 459; see *McNeil v. Wisconsin*, *supra*, 501 U.S. at p. 178 ["the *likelihood* that a suspect would wish counsel to be present is not the test . . ."].) Rather, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis*, at p. 459; see *Williams*, *supra*, 49 Cal.4th at p. 432; *Gonzalez*, *supra*, 34 Cal.4th at p. 1126 ["question is not what defendant understood himself to be saying, but what a reasonable officer in the circumstances would have understood defendant to be saying"].)

Thus, because a postwaiver invocation determination contemplates reference to a reasonable officer's understanding of a suspect's statements in light of known or objectively apparent circumstances, the suspect's subjective desire for counsel is not relevant. As *Davis* explained, while "requiring a clear assertion of the right to counsel might disadvantage some suspects who — because of fear, intimidation, lack of linguistic skills, or a variety of other reasons — will not clearly articulate their right to counsel although they actually want to have a lawyer present," it is the *Miranda* warnings themselves, which — when given to the suspect and waived prior to questioning — are " 'sufficient to dispel whatever coercion is inherent in the interrogation process.' " (*Davis*, *supra*, 512 U.S. at p. 460.) Even though officers may ask questions to clarify whether the right to counsel is being invoked, they are not obligated to do so. (*Id*. at p. 461.)

The requirement of an unambiguous and unequivocal assertion likewise applies to a suspect's invocation of the right to silence. (*Berghuis v. Thompkins*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2260]; accord, *People v. Martinez* (2010) 47 Cal.4th 911, 947-949 [officers need not clarify whether defendant is invoking

right to silence].) Not only is there "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel" (*Berghuis*, at p. 2260), but applying different rules "would be difficult for law enforcement officials to implement in the interrogation setting, especially where the suspect's ambiguous statements may relate to both the right to counsel and the right to remain silent" (*People v. Martinez*, at p. 949).

The rationale for requiring clarity is to protect lawful investigative activity, an obviously vital component of effective law enforcement. The Supreme Court has repeatedly emphasized that voluntary confessions are " 'a proper element in law enforcement' " and " ' "essential to society's compelling interest in finding, convicting, and punishing those who violate the law." ' " (*Maryland v. Shatzer*, *supra*, 559 U.S. at p. __ [130 S.Ct. at p. 1222].) Hence, after a suspect makes a valid waiver of the *Miranda* rights, the need for effective law enforcement weighs in favor of a bright-line rule that allows officers to continue questioning unless the suspect clearly invokes the right to counsel or right to silence.

There are important practical and policy reasons supporting this rule. When the interrogating officers "reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity,' . . . because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." (*Davis*, *supra*, 512 U.S. at p. 460, citation omitted.) Likewise, in the right to silence context, "[i]f an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' " (*Berghuis v. Thompkins*,

10

*supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2260].)  In such circumstances, suppression of a voluntary confession "would place a significant burden on society's interest in prosecuting criminal activity."  (*Ibid*.)

Applying the reasonable-officer approach, *Davis* agreed with the lower courts that the petitioner's remark to investigators — " 'Maybe I should talk to a lawyer' " — was not a clear and unambiguous assertion of the *Miranda* right to counsel.  (*Davis*, *supra*, 512 U.S. at p. 462.)  Similarly, in *Berghuis v. Thompkins*, the high court determined that a suspect's silence for nearly three hours during a custodial interrogation did not reflect an unambiguous assertion of the *Miranda* right to silence.  (*Berghuis v. Thompkins*, *supra*, 560 U.S. at p. __ [130 S.Ct. at pp. 2259-2260].)

Although the Supreme Court has not spoken on the matter, there appears no persuasive basis for exempting juveniles from *Davis*'s reasonable-officer standard.  The interest in protecting lawful investigative activity is equally weighty in the adult and juvenile contexts.  (See *Davis*, *supra*, 512 U.S. at p. 461.)  At the same time, juveniles subject to custodial interrogation are adequately protected by the following safeguards.

First, any custodial confession by a juvenile generally is not admissible if the juvenile did not receive proper advisement of the right to counsel and right to remain silent, or if the juvenile did not knowingly, intelligently, and voluntarily waive such rights.  As the Supreme Court has emphasized, "the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves.  '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.' "  (*Davis*, *supra*, 512 U.S. at p. 460.)

Second, as in the case of an adult's *Miranda* waiver, determining the validity of a juvenile's waiver necessitates inquiry into all the circumstances

11

surrounding a challenged interrogation, including "the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (*Fare*, *supra*, 442 U.S. at p. 725.) Thus, for purposes of waiver determinations, courts must consider a juvenile's state of mind, as well as all other circumstances, including a request for a parent, in order to ascertain whether the juvenile "in fact knowingly and voluntarily decided to forgo" his or her *Miranda* rights. (*Fare*, at p. 725.) This approach allows the necessary flexibility for courts "to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." (*Ibid*.)

Finally, courts must use " 'special care in scrutinizing the record' " to evaluate a claim that a juvenile's custodial confession was not voluntarily given. (*Lessie*, *supra*, 47 Cal.4th at pp. 1166-1167 [quoting *Haley v. Ohio* (1948) 332 U.S. 596, 599].) "If counsel was not present for some permissible reason when [a juvenile's] admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (*In re Gault* (1967) 387 U.S. 1, 55.) Consequently, even when a juvenile has made a valid waiver of the *Miranda* rights, a court may consider whether the juvenile gave a confession after being " 'exposed to any form of coercion, threats, or promises of any kind, [or] trickery or intimidation . . . .' " (*People v. Lewis* (2001) 26 Cal.4th 334, 383.)[3] The

---

**3**    Defendant does not contest the trial court's finding that no physical or psychological coercion impeded the voluntariness of his statements. At the hearing on the in limine motion, defendant had acknowledged that the

*(footnote continued on next page)*

constitutional safeguard of voluntariness ensures that any custodial admission flows from the volition of the juvenile, and not the will of the interrogating officers.[4]

Because juveniles have these protections, and because the need for effective law enforcement is the same in the adult and juvenile contexts, we are persuaded that juvenile postwaiver invocations are properly evaluated under the *Davis* standard. (Cf. *Fare*, *supra*, 442 U.S. at p. 725 [holding juveniles and adults subject to same approach for *Miranda* waiver determinations].) Accordingly, once a juvenile suspect has made a valid waiver of the *Miranda* rights, any subsequent assertion of the right to counsel or right to silence during questioning must be articulated sufficiently clearly that a reasonable police officer in the circumstances

---

*(footnote continued from previous page)*

investigators allowed him to use the bathroom during the interview and did not withhold food or drink from him. He also admitted there were no threats, no weapons, no handcuffs, and no promises made during the investigation.

[4] Additionally, article 15 of division 2, part 1, chapter 2, of the Welfare and Institutions Code provides statutory protections to certain juveniles. When an officer takes a minor to a place of confinement pursuant to that article, the officer "shall take immediate steps to notify the minor's parent, guardian, or a responsible relative that such minor is in custody and the place where he is being held." (Welf. & Inst. Code, § 627, subd. (a).) Within an hour after taking the minor into custody, the officer shall also advise the minor of the right to completed telephone calls to a designated adult and to an attorney. (Welf. & Inst. Code, § 627, subd. (b).) Although it appears that the exclusionary rule does not require suppression of a minor's in-custody statements when this statute has been violated (see *Lessie*, *supra*, 47 Cal.4th at p. 1161 & fn. 2), the threat of criminal sanctions provides a powerful incentive for statutory compliance. (Welf. & Inst. Code, § 627, subd. (b) [any officer who "willfully deprives" the minor of the "right to make such telephone calls is guilty of a misdemeanor"].)

would understand the statement to be an invocation of such rights. (*Davis*, *supra*, 512 U.S. at p. 459; see *Berghuis*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2260].)

### B. Application of the *Davis* Standard in the Instant Case

Consistent with *Davis*, the standard of review — like the standard applicable in the trial court — focuses on "whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney [or other individual] to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant." (*Gonzalez*, *supra*, 34 Cal.4th at p. 1125; accord, *Davis*, *supra*, 512 U.S. at pp. 460-462; *People v. Martinez*, *supra*, 47 Cal.4th at pp. 947-949 [right to silence].) As a reviewing court, we " 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' " (*Gonzalez*, at p. 1125; see *Lessie*, *supra*, 47 Cal.4th at p. 1169; *People v. Martinez*, at p. 949.) Although we review the record and independently decide whether the challenged statements were obtained in violation of *Miranda*, *supra*, 384 U.S. 436, we may " 'give great weight to the considered conclusions' " of the trial court. (*People v. Jennings* (1988) 46 Cal.3d 963, 979; see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1239.)

Here, investigators Salcedo and Sutton questioned defendant for over five hours, and the entire interrogation was both recorded and transcribed. At the hearing on the motion in limine, the trial court stated it had reviewed the videotape and considered what transpired at the interrogation. The court also received testimony from Salcedo and Sutton, as well as from defendant himself. Defendant acknowledged he had understood the *Miranda* rights that were read to him at the

14

start of the interrogation, and admitted there were no threats, no weapons, no handcuffs, and no promises from the investigators during the investigation. Defendant said he knew what an attorney was, because he had been represented by an attorney in juvenile court. Defendant had agreed to speak with the investigators, because he felt it would "seem funny" if he did not do so. He explained that, as the hours went on, he was "sort of being worn down" and getting tired and stressed as the investigators got tougher in their questioning. Defendant also admitted having lied to the investigators during the interrogation. The recording of the interview showed that defendant was deceptive throughout the five-hour session and admitted to wrongdoing only when confronted with evidence or caught in a lie.

In announcing its ruling, the trial court made an explicit finding that, based on its reading of the transcripts, listening to testimony, and viewing the recorded interview, defendant had "zero credibility." Then, after determining that defendant had made a knowing, intelligent, and voluntary waiver of his *Miranda* rights at the outset of the interrogation, the court addressed the issue at the heart of this matter. Summarizing the details of the interrogation and viewing defendant's statements in context, the court found that, whenever defendant requested to speak to his mother, he did so because he wanted to tell his mother what was going on and to ask her what he should do. The court further found that, even if defendant subjectively desired attorney assistance, his statements were objectively ambiguous because they were limited to the issue whether or not he should take the polygraph test.[5] That is, although defendant indicated reluctance to take the

---

[5] For this conclusion, the court specifically referenced defendant's statements to the investigators that his grandmother and brother told him to refrain from taking the test until he talked to his mother or an attorney.

15

test without speaking to his mother or a lawyer, he "continued to consent to voluntarily talk" to the authorities on other topics. The court also observed that, "even though in his own mind he thought his mother was [only] ten minutes away," defendant went ahead and signed a written confession without waiting for her arrival. Relying on *Davis*, *supra*, 512 U.S. 452, the court found that defendant did not invoke his *Miranda* rights, and that even if there was a request for an attorney, it was ambiguous and did not require cessation of the interview. As we shall explain, the trial court's conclusions are both legally and factually supported.

As a legal matter, we have already recognized in the waiver context that a juvenile's request to speak with a parent is neither a per se nor a presumptive invocation of Fifth Amendment rights. (*Lessie*, *supra*, 47 Cal.4th at p. 1168.)[6] There is an obvious reason for this: "the parental role does not equate with the attorney's role in an interrogation by police." (*People v. Maestas* (1987) 194 Cal.App.3d 1499, 1510, fn. 9.) Where, as here, a juvenile has made a valid waiver of his *Miranda* rights and has agreed to questioning, a postwaiver request for a parent is insufficient to halt questioning unless the circumstances are such that a reasonable officer would understand that the juvenile *is actually* invoking — as opposed to *might be* invoking — the right to counsel or silence. (See *Davis*, *supra*, 512 U.S. at pp. 458-459.)

Our review of the transcribed and videotaped interview finds ample support for the trial court's resolution of the conflicting inferences that may be gleaned from defendant's various requests and statements. (*Gonzalez*, *supra*, 34 Cal.4th at

---

**6**    *Lessie* disapproved *People v. Burton* (1971) 6 Cal.3d 375, which held that, in the absence of evidence demanding a contrary conclusion, a minor's request to see a parent must be construed to indicate an invocation of Fifth Amendment rights. (*Lessie*, *supra*, 47 Cal.4th at pp. 1162-1168.)

16

p. 1125.)  After waiving his *Miranda* rights, defendant was open and responsive to questioning on any topic.  Defendant, who was 15 years old, appeared confident and mature.  About three and a half hours into the interview, the investigators asked why defendant hurt Thompson and whether he was willing to take a polygraph test.  Defendant responded by asking to call his mother, and, when asked the reason for the call, he offered no indication that he wanted an attorney or that he did not want to talk further.  Instead, he specifically stated he wanted to let his mother "know what's happening" and to ask her what he should do because he was being accused of murder.  On this record, the trial court properly concluded that a reasonable officer in the circumstances would not have viewed defendant's request to call his mother as a clear and unequivocal invocation of the *Miranda* rights.  (See *People v. Maestas*, *supra*, 194 Cal.App.3d at p. 1509.)

As the interrogation proceeded, defendant asked several more times to call his mother when the investigators again asked about a polygraph test, or why he hurt Thompson.  The investigators generally did not inquire into the reasons for the subsequent requests, but defendant clarified a second time that he wanted to let his mother know "what's going on right now" and where he was.  Given the circumstances surrounding each of defendant's requests, a reasonable officer would not have understood any of them as an unambiguous assertion of *Miranda* rights.  Although defendant became increasingly upset during the interview, and quieter toward the end, the questioning properly continued because defendant never communicated an intent to stop the interview altogether.  (See *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. __ [130 S.Ct. at pp. 2262-2263].)

Defendant also informed the investigators that his grandmother and brother told him not to take a polygraph test "until my mom or a lawyer is here," and that those family members "don't want me to do anything until a lawyer or my mom is here."  Taken in context, these statements did not convey an unambiguous request

17

to halt all questioning, or a clear unwillingness to continue the interview without a lawyer. Rather, as the trial court observed, a reasonable officer could have understood defendant's statements as conveying a reluctance to take a polygraph test without first speaking to an attorney or his mother. Where, as here, the suspect makes a conditional invocation of counsel limited to the administration of a polygraph test, officers need not terminate the entire interrogation. (*People v. Martinez*, 47 Cal.4th at p. 952; see also *Gonzalez*, *supra*, 34 Cal.4th at pp. 1126-1127 [defendant conditionally wanted a lawyer if he was going to be charged]; *People v. Clark* (1992) 3 Cal.4th 41, 122-123 [defendant would not talk about an unrelated killing without an attorney present].) Furthermore, questioning need not halt simply because a suspect refuses, either conditionally or outright, to take a polygraph test. (E.g., *People v. Martinez*, *supra*, 47 Cal.4th at p. 952; *People v. Davis* (1981) 29 Cal.3d 814, 824-825 [16-year-old suspect's unwillingness to speak to polygraph administrator was not a general assertion of his right to remain silent].)

Likewise, defendant did not unambiguously assert his right to silence when he told the investigators at one point that he did not care who might be caught for Thompson's murder, "as long as you guys leave me alone." A reasonable officer in the circumstances could view that statement as an expression of frustration with the investigators' repeated refusal to accept his denial of guilt for the murder. (See *Williams*, *supra*, 49 Cal.4th at p. 433 [mere " 'expressions of passing frustration or animosity' " toward officers do not invoke the right to silence]; *People v. Jennings*, *supra*, 46 Cal.3d at pp. 977, 978 [" 'I'm not going to talk,' " and " 'That's it. I shut up,' " reflected "only momentary frustration and animosity" toward the questioning officer].)

Nor did defendant make a clear invocation when, toward the end of the interview, he asked the investigators for "a few minutes to myself" and for time to

"be alone until my family gets here." Notably, defendant clarified, when asked, that he simply wanted time to "be alone" and to "think about stuff" before writing out a statement about what happened to Thompson. In neither of these instances did defendant indicate, clearly or otherwise, that he was asserting his right to remain silent.

On this record, we conclude the trial court did not err in denying defendant's in limine motion. A reasonable officer in the circumstances would not have understood defendant's requests to call his mother, or any of his other statements, to be unambiguous and unequivocal invocations of his *Miranda* rights.[7] (*Davis*, *supra*, 512 U.S. at pp. 460-462; *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2260].) Accordingly, investigators Salcedo and Sutton were not required to stop their questioning, and defendant's custodial statements were properly admitted at trial.

---

[7] While this case was pending, the United States Supreme Court issued its decision in *J.D.B. v. North Carolina* (2011) __ U.S. __ [131 S.Ct. 2394], which addressed custody determinations for purposes of requiring *Miranda* warnings. In that case, the high court held that a child suspect's age, when known to the interrogating officer or objectively apparent to a reasonable officer, is relevant to the determination whether, considering all the objective circumstances of an interrogation, a reasonable person in the suspect's position would understand his freedom to terminate police questioning and leave. (*Id*. at p. __ [131 S.Ct. at p. 2406].) Contrary to defendant's assertions, nothing in *J.D.B.* calls for application of a subjective test to determine juvenile postwaiver invocations. While *J.D.B.*'s analysis generally supports the view that a juvenile suspect's known or objectively apparent age is a factor to consider in an invocation determination, knowledge of defendant's age would not have altered a reasonable officer's understanding of defendant's statements in the circumstances here. As indicated, defendant, who was 15 years old, appeared confident and mature.

### C. Inapplicability of the *Miranda* Waiver Test

The Court of Appeal held that *Davis*'s objective approach was inapplicable for juveniles and declined to assess defendant's postwaiver statements from the viewpoint of a reasonable officer. Instead, the court relied on *Fare*, *supra*, 442 U.S. 707, and *Lessie*, *supra*, 47 Cal.4th 1152, to hold that the postwaiver invocation determination required an examination of the totality of the circumstances in order to ascertain whether a juvenile suspect intended to assert the *Miranda* rights. Upon considering defendant's age, experience, maturity, and sophistication, as well as the length, intensity, and content of the entire interrogation, the court found that defendant's purpose when he first requested to speak with his mother was to secure her assistance to protect his Fifth Amendment rights.[8]

---

[8] The Court of Appeal explained its conclusion as follows. "After considering Nelson's age, experience, maturity, sophistication, the length, intensity, and content of the interrogation, we conclude Nelson's purpose in requesting to speak with his mother was to secure her assistance to protect his Fifth Amendment rights. Further evidence of Nelson's desire to invoke his *Miranda* rights is evidenced by his various requests to end the conversation about the murder. His words and conduct were inconsistent with 'a present willingness to discuss the case freely and completely. [Citation.]' [Citation.] In short, the record reflects a juvenile who persisted in his attempts to seek his mother's assistance in protecting his rights, who numerous times indicated he did not want to continue speaking, and after over five hours of interrogation submitted to the deputies['] insistence that he write out a confession." Although the Court of Appeal acknowledged that defendant was "no stranger to the criminal justice system" and was allowed "to make numerous unsuccessful attempts to contact his mother," it noted the additional circumstances that defendant was " 'really hungry' " after four hours of questioning, that he was "repeatedly tearful," and that he was a year younger and subjected to much lengthier interrogation than the juvenile suspects in *Fare*, *supra*, 442 U.S. 707, and *Lessie*, *supra*, 47 Cal.4th 1152.

The Court of Appeal's analysis is flawed in two significant respects. First, the court erred by focusing on what defendant may have subjectively wanted, instead of considering how a reasonable officer would have understood defendant's statements in the circumstances presented. *Fare* and *Lessie* are inapposite because those decisions addressed whether the juveniles involved made valid *waivers* of their *Miranda* rights. (*Fare*, *supra*, 442 U.S. at pp. 726-727; *Lessie*, *supra*, 47 Cal.4th at pp. 1169-1170.) Here there is no dispute that defendant understood and voluntarily waived his rights, and the only question is whether he subsequently *invoked* the right to have counsel present or the right to silence. It has long been settled that "[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." (*Smith v. Illinois* (1984) 469 U.S. 91, 98; see *People v. Martinez*, *supra*, 47 Cal.4th at p. 951.) Accordingly, *Fare* and *Lessie* do not support substitution of a subjective test in place of *Davis*'s objective approach when evaluating whether a juvenile suspect, having waived the *Miranda* rights, later asserted the right to counsel or right to silence. (See *People v. Martinez*, at p. 951.)

Second, it is correct that the objectively apparent circumstances in which a suspect made a postwaiver statement are relevant to an officer's understanding of the statement as an assertion of *Miranda* rights. But contrary to the Court of Appeal's analysis, a finding of a sufficiently clear invocation cannot be predicated upon unrelated discussions or events that occurred after the statement was made. Officers may, of course, try to clarify ambiguous statements (*Davis*, *supra*, 512 U.S. at p. 461), but generally a statement either is, or is not, an assertion of the right to counsel (*Smith v. Illinois*, *supra*, 469 U.S. at pp. 97-98). Thus, while the length, intensity, and content of an entire interrogation are relevant in assessing whether a suspect who waived the *Miranda* rights was subsequently *coerced* into involuntarily confessing (*Fare*, *supra*, 442 U.S. at p. 727; *People v. Richardson*

21

(2008) 43 Cal.4th 959, 992-993; cf. *People v. Neal* (2003) 31 Cal.4th 63, 80-85), we do not consider such circumstances because that contention is not at issue here. (See *ante*, fn. 3.)

## CONCLUSION AND DISPOSITION

Consistent with *Davis*, *supra*, 512 U.S. 452, we hold that, once a juvenile suspect has made a valid waiver of his or her *Miranda* rights, any subsequent assertion of the right to counsel or right to silence during questioning must be articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of such rights. Because this standard is an objective one, the invocation determination does not call for an evaluation of the juvenile's state of mind or subjective desire. We caution, however, that a particular statement found insufficiently clear in the circumstances of one case may nonetheless be deemed an unambiguous and unequivocal invocation when considered in the context of another case.

On this record, we find the trial court properly determined that a reasonable officer would not have understood defendant to be clearly and unequivocally asserting his *Miranda* rights when he asked to speak to his mother, or when he indicated his relatives did not want him to take a polygraph test without first speaking to his mother or a lawyer, or when he made references to being left alone. Accordingly, the investigators were not required to halt the interrogation at any point, and defendant's incriminating statements were admissible at trial. We

22

reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with the views expressed herein.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C. J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Nelson

_____

**Unpublished Opinion** XXX NP opn. filed 2/5/10 – 4th Dist., Div. 3
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S181611
**Date Filed:** January 12, 2012

_____

**Court:** Superior
**County:** Orange
**Judge:** Frank F. Fasel

_____

**Counsel:**

Mary Woodward Wells, under appointment by the Supreme Court, for Defendant and Appellant.

Rourke F. Stacy, Public Defender (Los Angeles) and Ji Seon Song, Public Defender (Contra Costa) for Pacific Juvenile Public Defender Center, Los Angeles County Public Defender, Contra Costa County Public Defender, Los Angeles County Alternate Public Defender, Loyola Law School Center for Juvenile Law and Policy and the Center for Wrongful Convictions of Youth as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, Steven T. Oetting, Elizabeth A. Hartwig and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mary Woodward Wells
Post Office Box 3069
Del Mar, CA  92014
(858) 481-5341

Rourke F. Stacy
Public Defender
210 W. Temple Street, 19th Floor
Los Angeles, CA  90012
(213) 974-3002

Donald W. Ostertag
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2278

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Nelson

_____

**Unpublished Opinion** XXX NP opn. filed 2/5/10 – 4th Dist., Div. 3
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S181611
**Date Filed:** January 12, 2012

_____

**Court:** Superior
**County:** Orange
**Judge:** Frank F. Fasel

_____

**Counsel:**

Mary Woodward Wells, under appointment by the Supreme Court, for Defendant and Appellant.

Rourke F. Stacy, Public Defender (Los Angeles) and Ji Seon Song, Public Defender (Contra Costa) for Pacific Juvenile Public Defender Center, Los Angeles County Public Defender, Contra Costa County Public Defender, Los Angeles County Alternate Public Defender, Loyola Law School Center for Juvenile Law and Policy and the Center for Wrongful Convictions of Youth as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, Steven T. Oetting, Elizabeth A. Hartwig and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mary Woodward Wells
Post Office Box 3069
Del Mar, CA  92014
(858) 481-5341

Rourke F. Stacy
Public Defender
210 W. Temple Street, 19th Floor
Los Angeles, CA  90012
(213) 974-3002

Donald W. Ostertag
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2278