Filed 4/14/26  In re E.P. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re E.P., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B341499 (Super. Ct. No. 21JV00138) (Santa Barbara County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>E.P.,<br><br>    Defendant and Appellant. | |

E.P. appeals from an order adjudicating him a ward of the court.  (Welf. & Inst. Code, [1] § 602.)  He contends the juvenile

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

court erred when it denied his motion to suppress (§ 700.1) statements taken in violation of *Miranda*.[2]  We affirm.

FACTS AND PROCEDURAL HISTORY

*The shooting and investigation*

E.P. is a Carpas gang member.  The Carpas gang territory is predominantly located in Carpinteria, and one of their rivals is the Eastside gang.  In March 2020, Eastside gang members were involved in a shooting at a Carpas hangout.  A gang expert testified this shooting was an "ultimate sign of disrespect" and that Carpas would look to retaliate.

In January 2021, Angel Castillo and Omar Montiel-Hernandez, two Eastside gang members, were murdered in a shooting that took place in Eastside territory.  Other individuals were also shot.  Surveillance videos showed that around 5:50 p.m., a Jeep circled the area of the crime scene and stopped on a nearby street.  The Jeep door then opened and closed, and shortly thereafter, there were gunshots.  Another video showed two individuals running from the crime scene.  A witness in the area also saw two individuals with firearms running past her.  The two individuals were later identified as Carpas gang members Oscar Trujillo and Angel Varela.

The Jeep was later "linked" to Varela.  Surveillance videos showed the Jeep arrive and park near Varela's home in Carpinteria after the shooting.  E.P., who was the driver, and Trujillo and Varela got out of the vehicle and went across the street to E.P.'s uncle's home.

Cell phone data showed that around 5:20 p.m. on the date of the shooting, E.P.'s phone "traveled" from Carpinteria to Santa

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

Barbara in the area where the shooting occurred. Afterward, around 6:20 p.m., the phone was back in Carpinteria. Varela and Trujillo's phones were all in the same location as E.P.'s phone. E.P.'s cell phone contained photos of firearms and of him "flashing" Carpas gang signs. The phone also contained texts on the day of the shooting in which Trujillo asked E.P. to drive the truck to the home of Varela's friend. The text was sent around 5:15 p.m., which was around the same time E.P. left for Santa Barbara. Days after the shooting, Varela sent E.P. a text asking him to pack up his clothes for him. During a search of Varela's iCloud account, the police discovered a picture of him holding a pistol that was identical to one of the weapons used in the shooting.

*The police station interview*

In April 2021, Santa Barbara Police Officer Megan Harrison testified that E.P. was arrested inside his home around 8:30 a.m. He was 18 years old at the time. Harrison "recited" E.P.'s Miranda rights around 8:45 a.m. and asked E.P. if he understood. E.P. said, "Yeah, I understand." E.P. was seated in the back of the patrol vehicle. He asked Harrison what he was under arrest for, and Harrison responded that he would be taken to the Santa Barbara police station and other officers would talk to him there. E.P. was then transported to the police station.

About fifteen minutes after being Mirandized, Sergeant Andre Miller and his partner interviewed E.P. in an interview room at the police station. It was around 9:00 a.m. E.P. was not handcuffed. Miller did not provide another *Miranda* advisement before the interview. But he conferred with Harrison, who told him E.P. had "been Mirandized and that [E.P.] had waived his

3

Miranda rights via implied waiver based on him understanding his rights and then asking her a question."

E.P. appeared "[l]aid back" and calm. At the beginning of the interview, E.P. was "not very forthcoming with a lot of information." As questioning continued, however, E.P. began providing more information about the day of the shooting. By the end of the interview, E.P. was "very talkative," relaxed, and walking around the interview room. Miller believed E.P. answered "freely and voluntarily" and did not show any distress during questioning. Miller offered food and water. E.P. ate throughout the interview, continued to ask for more food, and made a special request for McDonald's or Jack in the Box. He appeared "smiley, almost laughing" when making the food requests. There were also multiple breaks, and E.P. was allowed to use the bathroom.

E.P.'s story changed throughout the interview. For example, he first denied leaving Carpinteria but later said he "drove through" Santa Barbara. He admitted that he drove to the east side of Santa Barbara in Varela's Jeep and that Varela and Trujillo were with him. He admitted to dropping off Varela and Trujillo in the neighborhood in the east side and admitted that he knew they were going to "hit them up."[3] When asked why he was up in Santa Barbara, E.P. responded, "I don't want to throw anyone under the bus, you know?" and "It wasn't me." E.P. also stated, "It was a big mistake."

---

[3] Sergeant Miller testified that "hit them up" meant to "have a fistfight."

The entire interview lasted about seven hours. At the end of the interview when he was alone, E.P. positioned himself near the wall and attempted to hear what was being said in the interview room next door, where Varela was being interviewed. He began communicating with Varela through the wall to see what was said during their respective interviews.

*Procedural history*

The prosecution filed a delinquency petition (§ 602) alleging two counts of murder (Pen. Code, § 187, subd. (a); counts 1 and 2); two counts of attempted murder (Pen. Code, §§ 664, 187, subd. (a); counts 3 and 4); street terrorism (Pen. Code, § 186.22, subd. (a); count 5); and acting as an accessory (Pen. Code, § 32; count 6). As to counts 1 through 4, it was further alleged that E.P. committed the offenses for the benefit of a criminal street gang. (Pen. Code, § 186.22, subd. (b).) As to counts 1 and 2, the petition also alleged two special circumstances of a multiple murder and murder committed for gang purposes (§ 190.2, subds. (a)(3) & (a)(22)).[4]

E.P. moved to suppress (§ 700.1) his statements from the police station interview on the ground they were taken in violation of *Miranda.* The juvenile court denied the motion. The court found that "based on the totality of circumstances that

---

[4] In March 2022, the juvenile court granted the People's motion to transfer the matter to an adult criminal court, but after the passage of Assembly Bill No. 2361 (2021–2022 Reg. Sess.), our court remanded the matter for a new transfer hearing. The matter was returned to the juvenile court, and after a new transfer hearing, the court found E.P. fit to remain in the juvenile court's jurisdiction.

there was, in fact, a knowing and intelligent waiver by [E.P.]. It was an implied waiver."

At the conclusion of the adjudication hearing, the juvenile court sustained all counts and allegations. The court ordered E.P. committed to a Secure Youth Treatment Facility with a baseline term of seven years.

DISCUSSION

E.P. contends his statements made during the police station interview must be suppressed because the *Miranda* advisement was inadequate. He asserts he neither waived his rights nor was he re-warned prior to his interview. We are not persuaded.

Before a custodial interrogation, law enforcement must advise a suspect that they have " ' " ' "the right to remain silent, that anything [they say] can be used against [them] in a court of law, that [they have] the right to the presence of an attorney, and that if [they] cannot afford an attorney one will be appointed . . . prior to any questioning . . . ." ' " ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 157.) Once this *Miranda* advisement is given, the suspect may waive those rights explicitly or implicitly. (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).) " 'To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.' " (*Suarez*, at p. 160.)

A waiver is knowing and intelligent if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) "Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's

6

state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation].  When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given [to] him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*People v. Nelson* (2012) 53 Cal.4th 367, 375 (*Nelson*).)  In *Nelson*, our Supreme Court held that a 15-year-old defendant "implicitly" waived his *Miranda* rights " 'by willingly answering questions after acknowledging that he understood those rights.' " (*Ibid.*)

"On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence." (*People v. Williams* (2010) 49 Cal.4th 405, 425.)

We conclude there was a voluntary, knowing, and intelligent waiver of rights.  E.P. was 18 years old at the time of his arrest.  There is no dispute that Officer Harrison properly advised E.P. of his *Miranda* rights before he was transported to the police station.  When Harrison asked him if he understood, E.P. said, "Yeah, I understand."  E.P. then asked Harrison why he was being arrested.  Harrison told E.P. that other officers would talk to him at the police station.  About 15 minutes later, police officers interviewed E.P. at the police station.  He was not handcuffed and at one point, he walked around the interview room as he spoke to the officers.  E.P.'s demeanor was "[l]aid back" and calm, and by the end of the interview, he was "talkative" and appeared "smiley, almost laughing" when he made food requests.  There is nothing to indicate the officers raised their voice or threatened E.P. in any way.

When the interview was completed, E.P. moved closer to the wall adjoining the other interview room to share information with Varela about what was said in their respective interviews. In our view, such conduct reflects a level of sophistication and awareness of the situation. Based on the totality of circumstances, E.P. appeared to understand the *Miranda* warnings, was not coerced during his interview, and " 'willingly answer[ed] questions after acknowledging that he understood' " his rights. (*Nelson*, *supra*, 53 Cal.4th at p. 375.) Thus, E.P. waived his *Miranda* rights voluntarily, knowingly, and intelligently by responding to the officers' questions. (See *Cruz*, *supra*, 44 Cal.4th at p. 667 [a suspect's willingness to answer questions after acknowledging an understanding of their *Miranda* rights has been held sufficient to constitute implied waiver]; see *Nelson*, *supra*, 53 Cal.4th at p. 375 [same].)

E.P. contends that the *Miranda* advisement was inadequate because he was never re-warned about his rights at the time of his police station interview. We disagree. "[R]eadvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights." (*People v. Mickle* (1991) 54 Cal.3d 140, 170 (*Mickle*).)

We conclude that readvisement was unnecessary. E.P. was in custody in the police car when he was informed by Officer

8

Harrison that he would be interviewed at the police station by other officers, the subsequent interrogation took place a mere 15 minutes after E.P. was advised of his *Miranda* rights, it was clear that E.P. was still in custody at the police station, and E.P. showed no reluctance to speak to the interviewing officers. (See *Mickle*, *supra*, 54 Cal.3d at pp. 170–171 [subsequent interrogation 36 hours later was "reasonably contemporaneous" and no readvisement necessary where it was clear from the circumstances that defendant was still in official custody]; *People v. Williams*, *supra*, 49 Cal.4th at p. 435 [no readvisement necessary where second interrogation was 40 hours later and the defendant showed no reluctance to be interviewed].)

E.P. also contends the circumstances surrounding the interview were unduly coercive. He highlights that the interview was about seven hours long, he was denied use of the restroom when he requested to use it, and he was provided "minimal junk food." We again disagree. While the interview was about seven hours long, the record shows that E.P. was given breaks and food including chips, a candy bar, and a slice of pizza. And while E.P. was not immediately taken to the restroom upon request, the record does not reflect the officer's actions were improper. When E.P. asked to go to the restroom, the officer said, "Yeah, we'll get you there," and continued the interview. When E.P. asked again, the detective explained that there was "probably a little bit more" before they take a break and asked if it was "okay" to continue. E.P. responded, "Yeah." Shortly thereafter when E.P. asked again about the bathroom, he was taken to the restroom soon after.

Later, when E.P. asked to use the restroom in another instance, there was no bathroom availability, but the officers told

9

him, "We have other bathrooms, though. We'll figure it out." In short, the record does not reflect the officers withheld basic necessities such as bathroom use to coerce E.P. into confessing. The totality of circumstances reflect that E.P.'s will was not " 'overborne,' " but instead that E.P. was relaxed, talkative, and willing to speak to the officers. (*Cruz*, *supra*, 44 Cal.4th at p. 669.) Thus, this case is distinguishable from *In re Elias V.* (2015) 237 Cal.App.4th 568, 586, where the police used improper influences including aggressive and intimidating interrogation tactics on a 13-year-old minor.

We are mindful of E.P.'s youth and his lack of experience in the criminal and juvenile justice system. But on balance, the totality of circumstances support that E.P. waived his *Miranda* rights. Because we conclude there was no error in denying the motion to suppress, we need not discuss harmless error.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

BALTODANO, J.

We concur:

YEGAN, Acting P. J.

CODY, J.

10

Gustavo E. Lavayen, Judge

Superior Court County of Santa Barbara

———————————————

Courtney M. Selan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.