Filed 3/26/14  P. v. Ibarra CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056251 |
| v. | (Super.Ct.No. SWF10000903) |
| ERIC IBARRA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark A. Mandio, Judge. Affirmed.

Law Offices of E. Thomas Dunn, Jr., and E. Thomas Dunn, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Julie L. Garland, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Eric Ibarra guilty of one count of murder in the first degree (Pen. Code, §187, subd. (a); Count 1),[1] one count of attempted murder (§§ 664, 187 subd. (a); Count 2), and one count of being a felon in possession of a firearm (§ 12021, subd.(a); Count 4).  Gang and firearm enhancements were found for the murder charge.  (§§ 186.22, subd. (b), 190.2, subd. (a)(22), 12022.53, subd. (d).) Gang, firearm, and great bodily injury enhancements were added to the attempted murder conviction.  (§§ 186.22, subd. (b), 12022.53, subd. (d), 12022.7, subd. (a).)  A gang enhancement was also found regarding the weapons possession conviction. (§ 186.22, subd. (b).)  Defendant was sentenced to life without the possibility of parole for the murder; nine years for the attempted murder; and eight months, one third the midterm, for weapons possession.  In addition, defendant was given indeterminate terms of 25 years to life for the firearm enhancements, a 10-year term for the gang enhancement in connection with the attempted murder,[2] a three-year term for the great bodily injury enhancement in connection with the attempted murder, and a one-year term for the gang enhancement on the weapons possession charge.  All terms were to be served consecutive to the primary murder conviction.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  Under section 186.22 subdivision (b)(5), a gang enhancement to a first degree murder conviction carries no further penalty.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1009.)

Defendant raises three contentions. First, he asserts the prosecutor committed misconduct in his closing argument by misleading the jury about the applicable facts and law. Second, he contends his right to remain silent was violated when investigators did not immediately cease talking to him when he stated, "'I'll just stay quiet. I want to know what's going on.'" Last, he contends that the attempted murder conviction must be reversed because there was no showing that he intended to kill anyone when he fired a .357 Magnum revolver at a crowd. We find no error and affirm.

## FACTUAL AND PROCEDURAL HISTORY

On April 31, 2010, the victim was shot dead outside a house party in Lake Elsinore. He was a member of a gang or tagging crew called "Out Causing Panic," or OCP. Defendant was an associate or member of a rival local gang called "Elsinore Young Classics," or EYC. Although defendant admitted in a police interrogation that he shot at the victim, there is substantially contradictory testimony regarding the details of what took place. The witnesses were of divided sympathies and were mainly underage persons who were at a party where alcohol and drugs were available, and some of those were reluctant to speak to police or testify because of the gang associations of the victim and defendant. The testimonial discrepancies are not material.

The broad outline of the events is clear. The victim followed a group of young women who were leaving the party, attempting to get the phone number of Brenda DeLeon. After he got her number, he was told that the women were associated with the rival gang EYC and he became angry. He returned to the car, insulted the women

3

inside, threw his drink at the driver, spat at her, and proclaimed his allegiance to OCP. One of the women in the car was Jessica Ibarra, defendant's younger sister.

The women drove away; the victim and a friend walked back toward the party. He was then confronted in the street by defendant and a few others. After a brief argument, defendant shot the victim.[3] The victim was hit four times by .38-caliber bullets. Anthony Portillo, a bystander, was hit once in the thigh by a .38-caliber bullet. Marcy Murillo suffered an injury to her hand. The bullets that were recovered from the bodies of the victim and Portillo were fired by defendant's .357 Magnum revolver.

After the shooting, defendant and three others jumped into a car and drove off. Officer Gustavo Ibarra had just finished a traffic stop in the area when the car drove by. Because the car was traveling at a high rate of speed and had no plates, Officer Ibarra pulled it over. Defendant and two others were in the back seat; the passenger seat was empty. Officer Ibarra noticed three expended shell casings in the car once the occupants were out of the car. Two more shell casings and a .357 Magnum were later found in the car.

Defendant was interviewed on May 1, 2010, by Investigators Randy Wortman (Wortman) and Josh Button (Button). After obtaining defendant's full name and date of birth, Wortman gave him a form of the *Miranda* warning:

---

[3] There is conflicting testimony as to whether there were other shooters in defendant's group. Shell casings for .25-caliber bullets were recovered from the scene, but no one was struck by those bullets. Defendant did not assert that he was shot at by the victim nor anyone with him; no bullets, fragments, or strike marks were found behind defendant's position.

"Wortman: . . . Okay. Before we, we talk any further, I have to explain your rights to you. Okay. First of all you have the right to remain silent. Do you understand that?

"[Defendant]: Yeah. (affirmative).

"Wortman: Okay. Anything you say can and will be used against you in a court of law. Do you understand that?

"[Defendant]: Um hum. (affirmative).

"Wortman: You have the right to talk to a lawyer and have him present with you while you're being questioned. Do you understand that?

"[Defendant]: (inaudible)

"Wortman: And if you can not afford to hire a lawyer one will be appointed to represent you before any questioning if you wish one. Do you understand that?

"[Defendant]: Yeah. (affirmative)." (*Sic.*)

Questioning then began. After answering over 30 questions, defendant appeared to become "concerned" after he noticed a red activity light on a recording device held by Button.

"Wortman: Okay. Um, who was with you in the car?

"[Defendant]: Two other couples.

"Wortman: Okay, the same four of you guys that [got] pulled over? Did you guys go together to the party?

"[Defendant]: I don't know what's with all these questions, though.

"Wortman: Huh?

5

"[Defendant]: I know you're recording this fool, so um . . .

"Wortman: Okay.

"[Defendant]: I'll just stay quiet, I just want to know what's going on.

"Wortman: Okay, Um, I don't really understand what you're saying. Um, we, yeah, we're recording you. But the reason we're recording you is because when I run a report later on I want to remember everything that was said.

"[Defendant]: Yeah (affirmative).

"Wortman: Um, a lot of times we take notes, we write reports later on and we don't really remember exactly what was said. Then you guys read the reports and go "oh, that's not what I said." Okay. That's the fairest way to record . . .

"[Defendant]: Yeah. (affirmative)

"Wortman: . . . everything. Um, and these are just basic questions so I have an understanding. Obviously, um, there's some facts that can't really be disputed. First of all, you guys were in a car, the four of you, and that car got pulled over by the police last night. Deputy Ibarra as a matter of fact.

"[Defendant]: Yeah.

"Wortman: Um, and the four of you were in the car together. Um, this is just a question I had, it's just kind of just a basic question is, did you guys go to the party together and leave together? Or did you go up there separate and just kind of leave, and meet each other there, leave together? I'm just trying to get an idea. Cuz obviously I've spoken to a couple other guys and there's, there's four of you so it takes some time

6

and I do apologize for taking so long to get to you. Um, did you guys go up there together?

"[Defendant]: Oh, well they already told you, didn't they?

"Wortman: Hum?

"[Defendant]: They already told you, right?

"Wortman: Um, Adrian told me a handful of different stories to be honest with you. Um, he mentioned something about making an arrangement and walking and you guys picking him up and taking him to the party. It doesn't mean anything; I just want to know more background on you guys from last night.

"[Defendant]: Hum.

"Wortman: And, and just so you know, um, to be up front and honest with you completely, we've spoken to probably what would you say, three hundred people now.

"Button: Yep.

"Wortman: I mean we talked, you saw, we locked down that party and at the whole place was on, you know, det-, detention while we're talking to everybody. You're just one of the many, many, many people we've spoken to. Okay. So I, and I'm not coming at you accusing you or anything else. I'm just trying to link it in with everybody else. Everybody at the party was asked the same question. How did you get here, what car did you leave in, who did you leave with, that kind of stuff. Um, and I know you left the party with Adrian, okay and uh, the other two gentleman.

"Button: (inaudible) Is this bothering you?

"[Defendant]: Hum?

7

"Button:  Is that bothering you?

"[Defendant]:  Yeah.  (affirmative)"  (*Sic.*)

At that point, Button took a recording device, shut it off, and gave it to defendant.  Immediately thereafter, defendant resumed his participation in the interview:

"Wortman:  Quick minute, okay.  (inaudible) you can sit, okay?  Um, that is all.

"[Defendant]:  Yeah.

"Wortman:  Okay, cool.  Um . . . hey, I just want to clear; I know you left the party with these guys.  I just want to clarify you went together and left together.  That's all.

"[Defendant]:  Well, I left with 'em.

"Wortman:  Did you get there on your own, or did you get there with those guys?

"[Defendant]:  Well, I got there with them, with um, with Daniel."  (*Sic.*)

Defendant continued to answer questions.  Although he initially denied participating in the shooting, he admitted bringing the .357 Magnum to the party and shooting "like beside them, like to the side or something" of the victim.  Prompted by Wortman if he saw any of them "armed with a gun or a knife," defendant responded, "I saw something (inaudible) like something shiny in their hand."[4]  His admissions increased through the course of the interview.  Because he was "just kinda mad" at the OCP group, he fired "the whole barrel" at them.  "I just started shooting at the little

---

[4] Defendant later said he "saw something shining, some, somebody's hand" but it was not the victim who had the shining object, it "[w]as some other guy that was with him."

8

group" and then "just took off." He admitted hearing from people in DeLeon's car that there was trouble with OCP at the party, but denied that he had ever seen those women before. He steadfastly maintained that he was the only person in his group who shot.

Defense counsel objected to the admission of the recording, claiming that the *Miranda* warnings were ineffective and that defendant revoked his consent to be interviewed. The court heard the motion prior to the trial and took testimony from Wortman. Wortman testified that, when defendant stated he would stay quiet, Wortman believed defendant was uncomfortable being recorded talking about his gang associates because of a gang "code" against snitching. He understood defendant was not exercising his constitutional rights, but rather declining to be recorded speaking against the interests of gang members. He believed his understanding was confirmed when defendant resumed cooperation when Button ostentatiously shut off a superfluous recording device. The trial court found it was credible and not unreasonable that Wortman believed and responded as he did in response to defendant's statement and denied the motion.

## DISCUSSION

### A.    INVOCATION OF *MIRANDA* RIGHTS

Defendant asserts he made an unambiguous assertion of his right to remain silent when he stated, "'I'll just stay quiet. I just want to know what's going on.'"

A suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning; the police must explain this right to him before questioning begins. (*Miranda v. Arizona* (1966) 384 U.S. 436, 469-

9

473.) If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to conduct questioning. (*North Carolina v. Butler* (1979) 441 U.S. 369, 372–376.) *Miranda* dictates that, upon a suspect's subsequent invocation of his or her right to remain silent, the interrogation must cease. (*Miranda*, at pp. 473-474; *People v. Martinez* (2010) 47 Cal.4th 911, 947.) However, interrogating officers need only cease the interrogation when the suspect unambiguously invokes his right to remain silent. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381 (*Berghuis*).) If an ambiguous statement is made, the interrogators "are permitted to pose a limited number of followup questions to render more apparent the true intent of the defendant." (*People v. Williams* (2010) 49 Cal.4th 405, 429.) Although it is often "good police practice" for officers to make clarifying inquiries when the suspect makes an ambiguous or equivocal statement, there is no duty to do so. (*People v. Nelson* (2012) 53 Cal.4th 367, 377; *Davis v. United States* (1994) 512 U.S. 452, 461.) The test is objective, not subjective: How would a reasonable officer understand defendant's statement in the circumstances presented? (*Nelson*, at p. 384.)

Remarks that facially suggest a desire to halt police questioning do not, in fact, invoke the right to silence if they are reasonably viewed as unclear or equivocal. There is no specific language required or hard line demarcating what is considered an equivocal invocation. (See, e.g., *People v. Stitely* (2005) 35 Cal.4th 514, 534 [the defendant's statement "I think it's about time for me to stop talking" reasonably interpreted as only an expression of frustration]; *People v. Jennings* (1988) 46 Cal.3d 963, 977-978, fn. omitted [the defendant's remarks, "You're scaring the living shit out

10

of me. I'm not going to talk," and "I'm not saying shit to you no more, man. . . . That's it. I shut up" expressed "only momentary frustration and animosity" under the circumstances]; *People v. Farnam* (2002) 28 Cal.4th 107, 181 [ambiguity present in "'I'm not going to answer any of your fucking questions,'" and "'Fuck this, I'm not staying here anymore'"]; *People v. Martinez*, *supra*, 47 Cal.4th at pp. 949-950 [the defendant's remark, "That's all I can tell you," was reasonably viewed as meaning only "That's my story, and I'll stick with it"]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1211 [ambiguous invocation where suspect stated, "'I don't have a side of the story' and 'I don't want to talk about it'"].)  If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "'if they guess wrong,'" and place a significant burden on society's interest in prosecuting criminal activity. (*Berghuis*, *supra*, 560 U.S. at p. 382.)  If a suspect has invoked his or her Fifth Amendment right, further questioning is forbidden unless the suspect personally initiates further communications, exchanges, or conversations. (*People v. Gamache* (2010) 48 Cal.4th 347, 384.)  The question whether the suspect or the police reinitiated communication after the suspect's invocation of Fifth Amendment rights is predominately factual and reviewed under the substantial evidence standard. (*Id*. at p. 385.)

In considering a claim on appeal that statements were admitted in violation of a suspect's *Miranda* rights, we independently review the trial court's legal determination and defer to its factual findings if substantial evidence supports them. (*People v.*

11

*Williams*, *supra*, 49 Cal.4th at p. 425.) We "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.) Although we review the record and independently decide whether the challenged statements were obtained in violation of *Miranda*, we may "'give great weight to the considered conclusions'" of the trial court. (*People v. Jennings*, *supra*, 46 Cal.3d at p. 979; see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1239.)

Defendant initially asserts, but does not press the argument, that his *Miranda* waiver was incomplete because his response to Wortman's question whether he understood that he had a right to consultation with and the presence of an attorney was reported as "(inaudible)" on the transcript. Defendant has not alleged he did not understand that right. When the trial court held a hearing on the waiver, the issue of the inaudible response to that question was raised and Wortman confirmed defendant nodded his assent.[5] We defer to the trial court on this issue of inference from the record and witness credibility.

Defendant's asserts that his statement, "I'll just stay quiet. I want to know what's going on," represented an invocation of the right to remain silent. Defendant claims that this was an unambiguous request to remain silent. To hold otherwise, he argues, would effectively make "silent" a magic word, possessing a potency that "quiet" lacks. If an unambiguous request to remain silent has been made, the People must

---

[5] "[Prosecutor:] But the point I want to make is he nods his head upwards and downwards after you ask him that question; is that correct? [¶] [Wortman:] Yes."

scrupulously honor his request.  (*Michigan v. Mosely*, (1975) 423 U.S. 96, 100.)
Defendant asserts that questioning should have ceased.

The trial court found defendant's statements were ambiguous.  After responding to some substantive questions about his actions the night of the murder, defendant resisted further questioning when asked with whom he had come to the party.  Having heard Wortman's testimony, the trial court found it was "not unreasonable under those circumstances, in what he believes he knows about gang culture, to proceed on [the] assumption" that defendant was unwilling to be recorded giving information about fellow gang members.  Wortman testified regarding the "code of conduct" of gang members where "[t]hey'll admit to their own part but don't want to be on the record being—I'll use the quote 'rats' or 'snitches' basically."  The trial court noted defendant "immediately opens up again and begins that process of questioning and answering" once Button turned off his recorder.

There was no coercion, threats, or other compulsion addressed by either officer toward defendant to get him to talk.  (*Berghuis*, *supra*, 560 U.S. at p. 387.)  Wortman explained the usefulness of recorded interviews, gave the purpose for his line of questioning, and told defendant he was one of 300 people that had been interviewed by the police about that night.  Defendant was not threatened with punishment or adverse consequences if he chose not to speak:  Wortman gave a detailed answer to defendant's request to "know what's going on."  Further, Wortman was confirmed in his belief that being recorded violating the "gang code" was the source of defendant's unease when

13

defendant acknowledged to Button that the recorder was bothering him, and resumed speaking when it was turned off.

The fact Wortman's suspicion was proved correct does not in itself mean that it was reasonable, but the totality of circumstances provides sufficient support for the trial court's determination. Wortman testified to his training and experience in dealing with gang members and their code of conduct. It is notable that even after admitting his responsibility for the shooting, defendant would not confirm that Adrian Reyes was a gang member or even admit that he saw his own sister in DeLeon's car. Defendant's sudden reticence when questioned about his fellow gang members reasonably caused Wortman, an experienced officer, to suspect unease at being recorded. Finding substantial evidence supporting the considered conclusions of the trial court, we affirm.

Lastly, even if we were to hold that defendant effectively asserted his right to remain silent by stating that he would "stay quiet," he then undid that invocation by reinitiating conversation with Wortman. By posing the query "I just want to know what's going on," defendant initiated further conversation. Wortman had begun the interrogation by stating that he was going to be "explaining things" to defendant, and responded to defendant's query by giving an overview of the interrogation and the knowledge already held by the police. Although not strictly phrased as a question, defendant was clearly requesting information from the investigator: no "talismanic incantation" is necessary. Having invited resumption of the interrogation, defendant cannot complain that he was coerced into continuing (*People v. Gamache*, *supra*, 48 Cal 4th at p. 385 [defendant stated "I'd like to know what is going on before I answer any

14

more questions"]), and the police were not obligated to then renew the *Miranda* warnings they had just given. (*People v. Martinez*, *supra*, 47 Cal 4th at p. 950.)

We find no violation of defendant's *Miranda* rights or possible prejudice to him.

B.      PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Defendant argues the prosecutor's closing argument made misstatements of fact and law sufficient to lead the jurors to convict despite the evidence they received and the instructions given by the trial judge.

Prosecutors are given a broad ambit to frame and argue the evidence in closing argument, but they do not have an unlimited license. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury . . . . [W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

It is prosecutorial misconduct for a prosecutor to misstate the evidence. (*People v. Davis* (2005) 36 Cal.4th 510, 550.) "It is not, however, misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and

15

presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.) "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Proper instruction or admonishment by the trial court can cure possible prejudice to a defendant if a prosecutor oversteps the limits of argument.

"[A]rguments of counsel 'generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.' [Citation.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 703.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

We will not reverse a defendant's conviction because of prosecutorial misconduct unless we find it reasonably probable the result would have been more favorable to the defendant in the absence of the misconduct. (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.) Further, "'a defendant cannot complain on appeal of

16

misconduct by a prosecutor at trial unless in a timely fashion'—and on the same ground—'he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People v. Ashmus* (1991) 54 Cal.3d 932, 976.) The People argue defendant forfeited the argument by counsel's failure to contemporaneously object and request a jury admonition. It is true that no prosecutorial misconduct can be found if there is a failure to object, absent a showing of futility or impossibility of cure. (*People v. Clark* (2011) 52 Cal.4th 856, 960.) However, since defendant also argues that if he lost this claim through counsel's failure to object he received ineffective assistance of counsel, we will consider his claim that he was prejudiced by the comments.

Defendant asserts the prosecutor committed misconduct through misstatements of law and fact. "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 337.) The cited factual statements are that the jury was there "simply to decide, did [the victim] deserve to die"; that "you shoot somebody with a .38-caliber gun twice in the heart, a 20-year-old kid, that's first degree murder"; and that there was "no evidence before you that OCP—that anybody from OCP ever had a gun or fired a gun that night." Defendant spends very little time on these factual statements, arguing for the first two only that it "was not their job," and "that is not necessarily so."

The first statement is not misconduct. It was a rhetorical embellishment, and it is not likely that the jury substituted that argument for their instructions and decided the charges on that basis.

Immediately before the second statement, the prosecutor said, "This is not a manslaughter case. This is a first-degree murder case." It is clear from context that the second statement, on rebuttal, was not meant to define murder but to distinguish the charges in order to persuade the jury not to settle on a manslaughter conviction.

The prosecutor's assertion of "no evidence" that anyone in OCP had or fired a gun was hyperbole, but not far from truth. It is correct, as defendant charges, that there was some evidence before the jury that defendant reacted to a "glint" in someone's hand, which could have been a gun. Defendant at one point stated he was afraid of the glinting object "because it was a knife," but he said it might have been a gun. All of that evidence, however, came from defendant's statements in the recorded interrogation where he dimly recalled seeing something held by someone other than the person at whom he shot. There was no corroboration by other witnesses or physical evidence. The prosecutor's statement of "no evidence" was argument against the jury finding that defendant acted in self-defense. There was no evidence that the murder victim had anything in his hands. We find that this misstatement of fact was de minimus and harmless. We conclude that none of the complained-of factual misstatements raise any risk of corruption of the jury's verdict.

18

Defendant contends that the prosecutor's closing argument contained two misstatements of law. He asserts the jury was misled to believe they had to consider defendant's guilt on the charges in a specific order and that a mitigating defense of imperfect self-defense required the jury to find defendant reasonably believed that he had to use lethal force.

Regarding deliberations, the prosecutor told the jury that "in order for you to reach a verdict on either one of these counts of voluntary manslaughter, you must all 12 agree, first, that he's not guilty of first degree murder; second, that he's not guilty of second degree murder, before you come back with any verdict on either one of these theories of voluntary manslaughter." The People argue that the statement did not set an order for deliberation, but merely stated that those things must be done at some point before a verdict was returned. The interpretation is valid, but the prosecutor's use of "first" and "second" for his points could also have been construed not as items in a list but as ordinal points. It is possible the jury understood his remarks as setting a sequence for their deliberation.

In *People v. Kurtzman* (1988) 46 Cal 3d 322, 330, the trial court gave a "loose paraphrase" instruction in response to a potentially hung jury, which said they had to unanimously agree whether the defendant was guilty of second degree murder before they could consider voluntary manslaughter. (*Id*. at p. 327.) The jury had asked if they could return a guilty verdict on manslaughter despite not reaching unanimity on murder. In that paraphrase, the court said, "Before you get to the other lesser included offenses, I want to find out if you have unanimously agreed on the original charge, which is murder

19

in the first degree." (*Ibid.*) Our Supreme Court held this ordering arose from a misinterpretation of language in *Stone v. Superior Court* (1982) 31 Cal.3d 503, which held that a jury must be allowed to return a verdict on a greater offense if they were deadlocked on a lesser offense. Although *Kurtzman* recognized the People's advantage in having the jury consider the greatest offense first, it found no prejudice to the defendant because of the court's erroneous instruction and declined to reverse the verdict.

Here we do not deal with an instruction given from the bench, but an interpretation that can be given to the People's closing statements. The jury here was correctly instructed. After the arguments of counsel they were told that those arguments were not evidence and that they may consider the different kinds of homicide in any order.[6] Jurors are presumed to follow the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717.) It is not likely counsel's argument had an effect upon the jury, and, most tellingly, defendant presents

---

[6] It is interesting to note that after the court instructed the jury they could consider the homicide charges in any order, the court then gave an instruction containing a list of directions, the first being, "One. If all of you agree that the People have proved beyond a reasonable doubt that the defendant is guilty of first degree murder, complete and sign that verdict form." Counsel's argument is similar.

no evidence here showing he was prejudiced by counsel's remark. Given the evidence on the record, it is not enough for defendant to summarily state that "it cannot be said with any confidence that the jurors were well enough informed or willing to ignore the prosecutor's directive."

Second, defendant argues the prosecutor advised the jury they could not find imperfect self-defense unless they concluded that defendant "***reasonably*** *believed* it was necessary for him to use lethal force." Defendant does not cite a specific statement or section in the record from which this conclusion is drawn. The closest parallel is in his summary of the prosecutor's argument at page 546 of the reporter's transcript where he quotes from the conclusion: "'There's no evidence that [defendant] thinks [any] differently than a reasonable person. And you as jurors are instructed to kind of think like reasonable people.'"[7] This does not relate to the standard for imperfect self-defense. Further, two paragraphs prior to that remark, the prosecutor told the jury, "Let's talk about imperfect self-defense and why it doesn't apply. It's basically [where] a reasonable person would say, 'This doesn't warrant the use of the amount of force that is used here. But the defendant unreasonably, but actually, believed that the amount of force was necessary in order to protect himself.'" This was a fair summary of the defense. Defendant has the responsibility to pinpoint the evidence supporting his

---

[7] Defendant's other supporting citation to the record— that, "'defendant can't create his own standard'"—comes from the prosecutor's discussion of the heat-of-passion defense, not from imperfect self-defense.

factual assertions, but has not done so here.  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  Review of the record shows that the prosecutor described the law correctly.

In his subsection titled "Failure to Object," defendant attempts to demonstrate prejudice.  The demonstration depends upon a finding that the prosecutor misled the jury into believing imperfect self-defense requires a reasonable belief that lethal force was necessary.  Given that, defendant states he was prejudiced because the jury was precluded from considering voluntary manslaughter until after they had voted on murder.  If the jury had understood imperfect self-defense, the argument goes, they would have convicted defendant of voluntary manslaughter if they did not have to consider murder first.  In addition to being contrary to the facts, as outlined above, the argument is entirely speculative.  Defendant's argument does not suffice to undermine the reliability of the jury's verdict.  (*Strickland v. Washington* (1988) 466 U.S. 668, 694.)

We find no prejudice to defendant from the prosecutor's statements in argument.

C.      INTENT REQUIREMENT FOR ATTEMPTED MURDER

Defendant asserts he lacked a specific intent to kill Anthony Portillo despite emptying the barrel of his handgun by shooting in Portillo's direction and hitting him in the thigh.

The question of whether defendant had the requisite intent to kill is a question for the fact finder.  (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)  On appeal, instead of reweighing the evidence or redetermining the credibility of witnesses, we need only "determine the legal sufficiency of the found facts" and need not "second guess the

22

reasoning or wisdom of the fact finder." (*Ibid*.) Based on our review of the record, we conclude substantial evidence supports the jury's finding that defendant's actions demonstrated an intent to kill. "The point is that where the act of purposefully firing a lethal weapon at another at close range gives rise to an inference of intent to kill, that inference is not dependent on a further showing of any particular motive to kill the victim." (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Defendant asserts there is no evidence he "specifically intended to kill anyone who was not charging towards him before his weapon was fired." That argument misstates the evidence—testimony was received that the victim was retreating from defendant with his hands held over his head in a surrender gesture. The jury could reasonably find that defendant fired as part of an altercation between gangs and intended to shoot members of OCP who were attending an OCP party. Even if defendant did not know that Portillo was a member of OCP, he was part of a group that defendant identified as enemies and wished to kill. Substantial evidence supported defendant's specific intent to kill Portillo.

Defendant argues it is inconsistent that he was convicted of the attempted murder of Portillo but not of Murillo, stating that it could only be because Portillo was an OCP gang member and that "the jurors were likely swayed to sustain any charge against [defendant] that seemed to be gang-related." We are not persuaded. A bullet from defendant's gun was taken from Portillo's leg; Murillo had an injury to her hand of unproven origin. It is not inconsistent or meaningful that defendant was convicted of

attempting the murder of Portillo but not of Murillo because there was very little evidence that Murillo was injured by a bullet fired from defendant's gun.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.