Filed 9/12/16  P. v. Bonilla CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>NEFTALI BONILLA,<br><br>     Defendant and Appellant. | F070035<br><br>(Super. Ct. No. VCF284150)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Following a gang-related shooting death, defendant Neftali Bonilla was charged with first degree murder in violation of Penal Code section 187, subdivision (a).[1] A jury convicted him of the lesser included offense of second degree murder and found true the enhancements he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)) and a principal used a firearm in the commission of the crime (§ 12022.53, subds. (d) & (e)(1)). Defendant was sentenced to 15 years to life for second degree murder plus an additional 25 years to life for the firearm enhancement, for a total state prison term of 40 years to life.

It was defendant's confession during interrogation that linked him to the murder. Defendant was a juvenile at the time of the crime and, on appeal, he argues that his confession should have been excluded at trial because the advisement of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) was confusing and therefore inadequate, and he did not knowingly, intelligently and voluntarily waive his rights. He also argues the trial court erred (1) in admitting text messages that were both irrelevant and unduly prejudicial (Evid. Code, §§ 351, 352) and (2) in instructing the jury on a defendant's failure to explain or deny adverse evidence because it found his testimony implausible.[2] The People raise the issue of forfeiture and also maintain the *Miranda* warnings given were adequate and defendant's confession was voluntary; the trial court did not abuse its discretion in admitting text message exchanges from the day of the crime; and the trial court did not err in instructing the jury on CALCRIM No. 361 because implausibility is a ground that supports the instruction. Defendant contends to the extent any claims were forfeited by his failure to move to suppress evidence or to object at trial, his trial counsel was ineffective.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     CALCRIM No. 361.

We reject defendant's challenges and affirm the judgment.

## FACTUAL SUMMARY[3]

As a teenager, defendant became a member of the South Side Kings gang, which is a subset in Tulare County of the Sureño gang.[4] Several years later, on the night of June 6, 2013, there was a drive-by shooting at a residence on West Vine Street in Visalia. Two teenagers were hit by the gunfire and wounded. One of the teenagers, Alex V., was a Sureño gang member.

The next night, a group of gang members that included defendant and Angel Espindola gathered at the residence on West Vine where Alex V. had been shot the night before.[5] Espindola and others wanted defendant to go with them to find a "Northerner." Thereafter, around 11:30 p.m., a shooting was reported. When police arrived, they found Jose Garcia, a member of the North Side Visas, a subset of the Norteño gang and a rival of the Sureños, lying dead on West Vine. Garcia had been shot multiple times. Still in his right hand was a large .44 Magnum revolver with six spent shell casings in the cylinder.[6] Police located casings and a live bullet comprised of three different calibers, but the only gun ever recovered was the victim's revolver.

The police searched residences on the north side of West Vine, ultimately focusing on two houses, including the one where Alex V. was shot the night before. Espindola was discovered in one of the bedrooms of the house, in the process of changing clothes.

---

**3** Our summary of the facts is brief because defendant is not challenging the sufficiency of the evidence against him.

**4** Defendant testified he was jumped into the gang at age 16, but his involvement or association with gangs began when he was 13 or 14 years old.

**5** Alex V. apparently lived next door to the house where he was shot. Defendant knew Alex V. and testified he, Espindola, and Espindola's cousin Matthew went to Alex's house on West Vine to check on him. Because Alex was still in the hospital and his family was not home, they went next door.

**6** The victim's gun retained spent casings in the cylinder rather than ejecting them after firing.

3.

He was sweating profusely and pulling on a red shirt.[7] A black and gray striped shirt was found under some other clothing in the bedroom, along with some shoes with fresh mud on them. Defendant was subsequently arrested after he jumped the back fence of the house into an empty field and ran.

Defendant was interrogated by detectives at the police station for approximately two hours and his statement was admitted at trial. He admitted being present when Garcia was shot on West Vine, but initially denied being armed. He next admitted he was armed, but denied firing his gun; then admitted firing one time, and finally admitted firing three times, including once at Garcia. At trial, defendant testified and denied being armed or firing a gun. He stated he felt "peer pressur[ed]" to say he shot three times and he lied about shooting a gun because he wanted to go home.

Defendant was not alone that night and, during interrogation, he said Espindola and two Asian men he identified as Dominic and Ainoy Saesee were with him when they encountered the victim. At trial, defendant testified he was with four others: Espindola, Espindola's cousin Matthew, Dominic, and an Asian man.[8] Gunshot residue tests conducted the night of the shooting were positive for the victim, Espindola, and Michael See, and inconclusive for defendant, Dominic and Ainoy Saesee.

Two eyewitnesses to the shooting testified at trial. The first witness told police he saw a man in a gray and black striped shirt and two other men in white shirts carrying "rifle type guns" heading westbound on West Vine. They were shooting westward but he was unable to see who they were shooting at. He stated there were "too many shots to count," and he identified Espindola as the main shooter wearing the striped shirt. In a

---

[7]   This was notable because the color red is associated with the Norteños.

[8]   A positive result indicates the discharge of a firearm or presence in an environment of gunshot residue. An inconclusive, or negative, result could indicate any of the following: a firearm was not discharged, a firearm was discharged but did not deposit gunshot residue on the hands, or a firearm was discharged but the residue was removed. It is also possible there was gunshot residue present but just not in the area sampled.

4.

second statement to police, he reported seeing the victim firing shots. At trial, he testified reluctantly that he heard three shots; saw a group of three people, one of whom was carrying a rifle or a shotgun; and saw the person with the long gun shooting, but did not see what he was shooting at.[9]

The second witness testified he heard eight or nine gunshots, dropped to the ground, and saw muzzle flashes, possibly from two guns. During this time, he saw two guys in the middle of the street wearing white shirts, but he was unable to identify anyone.[10] He later saw defendant jump the fence and get apprehended by police.

### DICUSSION

### I.     Admission of Confession

### A.     Standard of Review

The Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that "'"[n]o person … shall be compelled in any criminal case to be a witness against himself …."'" (*People v. Nelson* (2012) 53 Cal.4th 367, 374.) In *Miranda*, the United States Supreme Court held "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda*, *supra*, 384 U.S. at p. 444.) The court articulated four procedural warnings necessary to safeguard the constitutional privilege against self-incrimination: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence

---

[9]     The witness's prior inconsistent statements to police were introduced at trial. (Evid. Code, §§ 1235, 770.)

[10]     The victim was found in an extremely dark area of the street, and defendant was wearing a black shirt. Detective Jennings testified when he canvassed the neighborhood and stood in the area where the witnesses were located, he was unable to view the area where evidence markers Nos. 2 and 8 were located, a location consistent with the area defendant's statement and trial testimony placed him.

against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Ibid.*; *Florida v. Powell* (2010) 559 U.S. 50, 59–60.) "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda*, *supra*, at p. 444; *Florida v. Powell*, *supra*, at pp. 59–60.) While the wording may vary, the "'*Miranda* warnings'" must "'reasonably "conve[y]"'" these rights to suspects. (*Florida v. Powell*, *supra*, at p. 60.)

While the rights can be expressly or impliedly waived, "there is a threshold presumption against finding a waiver of *Miranda* rights." (*People v. Cruz* (2008) 44 Cal.4th 636, 668.) Therefore, "[t]o establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*People v. Nelson*, *supra*, 53 Cal.4th at pp. 374–375.) In cases involving juveniles, age is relevant. (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 274, 277; *People v. Nelson*, *supra*, at p. 379; *People v. Lessie* (2010) 47 Cal.4th 1152, 1169.) "[W]e inquire 'into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.'" (*People v. Lessie*, *supra*, at p. 1169.) "[T]he required inquiry 'includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" (*Ibid.*)

On appeal, "'"we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." [Citation.]' [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 753; *People v. Lessie*, *supra*, 47 Cal.4th at p. 1169.) "Where, as was the case here, an interview is recorded, the facts

6.

surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

## B.    Forfeiture

Defendant did not object to admission of his statement at trial, and the People contend he forfeited his challenge to its admission as obtained in violation of *Miranda*. In response, defendant asserts the forfeiture rule is intended to give the trial court the opportunity to consider the issue and it did so, thereby fulfilling the policy objective underlying the rule.

Here, the prosecution filed a motion in limine requesting admission of defendant's statement.[11] The trial court inquired whether an Evidence Code section 402 hearing would be required, and defense counsel remarked it would be good to have one, in furtherance of the court's gatekeeping function. The court then informed the parties the statement appeared admissible on its face, but they would have a brief hearing prior to admission of the statement. After the investigating officer testified at trial, the court found no *Miranda* issues and admitted the statement without objection. In doing so, the court noted defendant was born in Merced, previously talked to the police and was read his *Miranda* rights, admitted to being on probation, said he understood his rights, and agreed to talk to officers.

"'The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal.'" (*People v. Crittenden* (1994) 9 Cal.4th 83, 126; *People v. Mattson* (1990) 50 Cal.3d 826, 854.) This requirement "both … enable[s] the court to make an informed ruling on the motion or objection and … enable[s] the party proffering the evidence to cure the defect in the evidence." (*People v. Mattson*, *supra*, at p. 854.)

---

[11]    The motion was erroneously described as an opposition in the opening sentence.

7.

While the trial court generally addressed the admissibility of defendant's statement in the context of the prosecution's motion for admission of the statement, defendant neither sought to suppress his statement prior to trial nor objected at trial. As a result of defendant's failure to challenge the admission of his statement, "the trial court had no opportunity to resolve material factual disputes and make necessary factual findings" relating to the issues defendant now raises on appeal, including any confusion caused by Detective Jennings's commentary surrounding the advisement and defendant's age, education level, possible mental health issues, and level of exhaustion as factors affecting whether any waiver was knowing, intelligent and voluntary. (*People v. Scott* (2011) 52 Cal.4th 452, 482). Accordingly, we find the claim forfeited and are unpersuaded by defendant's contrary argument. (Evid. Code, § 353, subd. (a); *People v. Linton* (2013) 56 Cal.4th 1146, 1170; *People v. Scott*, *supra*, at pp. 481–482; *People v. Crittenden*, *supra*, 9 Cal.4th at p. 127; *People v. Mattson*, *supra*, 50 Cal.3d at pp. 853–854; *People v. Polk* (2010) 190 Cal.App.4th 1183, 1193–1195.) Defendant's claim also fails on the merits, however.[12]

## C.    Adequacy of Warnings

The precise wording of the *Miranda* warnings may vary but, to be adequate, the warnings must "'reasonably "conve[y]"'" these rights to suspects. (*Florida v. Powell*, *supra*, 559 U.S. at p. 60; *People v. Nelson*, *supra*, 53 Cal. 4th at p. 378.) Defendant concedes the wording of the warnings given was technically adequate, but contends Detective Jennings's reference to television shows created confusion, rendering the warnings inadequate. The People maintain the warning reasonably conveyed defendant's rights to him.

---

[12]    Given our rejection of defendant's claim on the merits, we do not reach his claim of ineffective assistance of counsel claim, but observe "that a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14.)

After asking some initial background questions such as name and birthdate, the following advisement occurred:

"JENNINGS:  Um, there's just some for—some formal stuff that we have to do sometimes.  Ever—do you ever watch like crime shows at all?  You ever watch COPS and all that kind of stuff?

"[DEFENDANT]:  Yeah.

"JENNINGS:  You remember—do they ever bring out a card like this and they whip it at you and say you have the right to remain silent?

"[DEFENDANT]:  Yeah.

"JENNINGS:  And anything you say may be used against you in court.  You have the right to have an attorney present before and during any questioning and if you cannot afford to hire an attorney one will be appointed to represent you free of charge before and during any questioning if you wish.  Did you understand all that?

"[DEFENDANT]:  Yeah.

"JENNINGS:  Yeah.  Did you ever hear that on any of those crime shows at all?

"[DEFENDANT]:  Yeah.

"JENNINGS:  Yeah.  It's kind of one of those standard things where they—where they throw that out at people and stuff.

"[DEFENDANT]:  Um-hum."

Detective Jennings then proceeded with the interrogation.

The *Miranda* warnings provided by Detective Jennings apprised defendant of his rights, and we are not persuaded that Jennings's comments and questions regarding television shows such as COPS so confused the warnings they were rendered inadequate. (*People v. Hensley* (2014) 59 Cal.4th 788, 809.)  We have the benefit of viewing the audiovisual recording of the interrogation.  Defendant was specifically asked by Jennings if he understood the rights read to him and he responded affirmatively.  Defendant is a native Californian, fluent in English and the recording provides no support for a claim of

9.

confusion. Defendant was notably composed, and any argument his ability to comprehend the warnings was compromised by low intelligence, mental health issues, or other factors finds no support in the record.

Defendant cites three cases from the Court of Appeals for the Ninth Circuit in support of his argument. As the People note, we are not bound by these decisions (*People v. Williams* (2013) 56 Cal.4th 630, 668), but we find them unpersuasive in any event. The warnings given the juvenile in *Doody v. Ryan* (2011) 649 F.3d 986, 1006 (en banc) "went beyond administering the standard form, consuming twelve transcribed pages in minimizing the importance of the *Miranda* warnings and affirmatively advising [the defendant] that he had a right to counsel *if* he was involved in a crime." The detective also disregarded the defendant's expressed lack of knowledge concerning the *Miranda* warnings and his subsequently conveyed confusion in the question "'what's this for?'" (*Doody v. Ryan*, *supra*, at p. 1004.)

In *United States v. San Juan-Cruz* (2002) 314 F.3d 384, 387–388 (*San Juan-Cruz*), the defendant was read his administrative rights and then his *Miranda* rights by the same Border Patrol agent. There was a conflict between those rights with respect to counsel, and the court found the defendant "could not reasonably ascertain from the warnings provided to him by the Government whether he could or could not retain the services of an attorney for free." (*San Juan-Cruz*, *supra*, at p. 388.) "[T]he substance, content, and clarity of the warnings" did not convey to the defendant his rights under *Miranda* and the warnings were therefore inadequate. (*Id.* at p. 389.)

Finally, the Seventh Circuit found the *Miranda* warnings given in *United States v. Wysinger* (2012) 683 F.3d 784, 803 "inadequate and misleading" where "the warning [the agent] gave applied only to 'questioning,' because it erroneously suggested that [the defendant] had to choose between having a lawyer present before questioning or during questioning, and because the agents used various tactics to confuse [the defendant] regarding the start of 'questioning' and divert him from exercising his rights …."

10.

No similar missteps occurred in this case. Defendant was not misled regarding his rights or the consequences of invoking those rights. (*People v. Russo* (1983) 148 Cal.App.3d 1172, 1177–1178; *United States v. Wysinger*, *supra*, 683 F.3d at p. 803; *Doody v. Ryan*, *supra*, 649 F.3d at p. 1006.) Nor was he confused. (*San Juan-Cruz*, *supra*, 314 F.3d at pp. 387–388.) The California Supreme Court has recognized that "evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision—by 'playing down,' for example, or minimizing their legal significance—may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1237; *People v. Johnson* (2010) 183 Cal.App.4th 253, 294.) Here, although Detective Jennings bookended the *Miranda* warnings with comments and questions regarding television shows and described the warnings as "one of those standard things," he accurately advised defendant of the four *Miranda* warnings at one time and immediately followed them by asking if defendant understood. Defendant responded affirmatively. Moreover, the entire exchange fills a mere half page of the transcript, and defendant expressed no lack of knowledge or confusion and at no time attempted to invoke his rights.

In his reply brief, defendant cites *Missouri v. Seibert* (2004) 542 U.S. 600, a plurality decision.[13] The absence of a majority opinion notwithstanding, that case addressed the police practice of interrogating a suspect without any *Miranda* warnings until a confession was obtained. (*Missouri v. Seibert*, *supra*, at p. 604.) Thereafter, the suspect was given the warnings and interrogated again to reobtain the confession. (*Ibid.*)

---

[13] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds….' [Citation.]" (*Marks v. United States* (1977) 430 U.S. 188, 193.)

The Missouri Supreme Court held the second statement was not voluntary and should have been suppressed; the United States Supreme Court affirmed the decision. (*Ibid.*)

In this case, defendant is challenging the adequacy of the *Miranda* warnings given him after some preliminary background questions but prior to any substantive interrogation. In contrast, *Missouri v. Seibert* involved the failure to give any *Miranda* warnings until the suspect confessed, which occurred approximately one hour after she was brought to the police station and after she was interrogated for 30 to 40 minutes. (*Missouri v. Seibert*, *supra*, 542 U.S. at pp. 604–605.) We do not find the facts of this case analogous to those in *Missouri v. Seibert* and we conclude defendant was properly advised of his rights. (*Florida v. Powell*, *supra*, 559 U.S. at p. 62; *People v. Nelson*, *supra*, 53 Cal.4th at p. 378.) Defendant's claim that the otherwise technically correct *Miranda* warnings were rendered "so ambiguous or confusing" as to mislead him regarding his rights is unsupported by the record and we reject the argument. (*People v. Wash* (1993) 6 Cal.4th 215, 236–237.)

### D.  Knowing, Intelligent and Voluntary Waiver

In addition to the adequacy of the warnings, defendant challenges his waiver as not made knowingly, intelligently and voluntarily.

"The test for determining whether a confession is voluntary is whether the questioned suspect's 'will was overborne at the time he confessed.' [Citation.] 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions.' [Citation.]" (*People v. Cruz*, *supra*, 44 Cal.4th at p. 669.) "'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."'" (*People v. Cunningham* (2015) 61 Cal.4th 609, 643.)

As noted, we have viewed the recorded interrogation. At the time, defendant was 17 and one-half years old, and the recording reveals not a frightened, immature child but

12.

a calm, composed young man. As noted *ante*, defendant was born in California and, while defendant's exact level of education is unclear, he understood what was said to him and asked of him, and he responded appropriately.**14**

On appeal, defendant points out he was a field worker who had been up for 24 hours by the time he was interrogated, and the probation officer documented two prescriptions for medication used to treat psychiatric conditions. However, although defendant testified at trial he worked in the fields and got up at 4:30 a.m. the day of the shooting, he displayed no sign of fatigue during the interrogation and stated only that prior to the shooting, he was getting tired and was ready to go home. Regarding medication, defendant appears to have self-reported to the probation officer that he took two prescriptions to help him sleep and because he hears voices. Defendant also simultaneously self-reported no medical or disability issues. The probation report was prepared after trial, and defendant cites to no evidence in the record he was on the medications at the time of the interrogation, let alone whether, or to what extent, either the medications or his underlying conditions impacted his mental state at the time of the interrogation. We note defendant was coherent and lucid, and while he appeared to tear up several times during the interrogation, he was not overcome with emotion, he retained his composure throughout, and we would not describe the interrogation as emotionally charged.

We conclude defendant "'ha[d] the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" (*People v. Nelson*, *supra*, 53 Cal.4th at p. 375.) His statement was therefore properly admitted and we reject his claim to the contrary.

---

**14** Defendant testified he has a sixth grade education, but he also testified he was in the seventh grade when bullying led him to become involved with gangs. The probation report indicates defendant last attended 11th grade at a continuation high school.

13.

## II.     Admission of Text Messages

Next, defendant contends the trial court abused its discretion in admitting text messages retrieved from his cell phone because they were irrelevant and prejudicial. Defendant also claims his counsel was ineffective in failing to bring a factual error in Detective Jennings's testimony regarding the time of the text message exchanges to the court's attention. The People respond there was no abuse of discretion in admitting the relevant text messages and defendant forfeited any challenge to the timing of the messages by failing to object to Detective Jennings's testimony.

### A.     Background

The following text messages were retrieved from defendant's cell phone and admitted at trial:

From "Miriam" at 08:37:49 PM (GMT-7): "Where u at?"

To "Sporty" at 08:53:50 PM (GMT-7): "I need a ride g"

From "Lupe" at 08:59:10 PM (GMT-7): "W[h]ere u at??"

From "Sporty" at 08:59:29 PM (GMT-7): "Where to[?]"

To "Lupe" at 08:59:55 PM (GMT-7): "Not yet ok[a]y around 1030 11"

To "Sporty" at 09:00:06 PM (GMT-7): "To do the thing"

From "Sporty" at 09:04:36 PM (GMT-7): "Hold up"

From "Drupy" at 09:55:26 PM (GMT-7): "What happened?"

From "Lupe" at 10:08:36 PM (GMT-7): "W[h]ere u at?"

The prosecution argued the exchange between defendant and Sporty regarding doing "the thing" was relevant to the issue of premeditation because it referred to a plan to shoot Norteños in retaliation for the drive-by shooting the night before. The trial court addressed the issue during the motions in limine hearing and stated that although it could be argued the statement was "very equivocal," it was circumstantial evidence of planning. Defendant's trial counsel objected to the admission of the text messages on the grounds they were vague, ambiguous and prejudicial. The trial court ruled the texts were

14.

admissible and explained, "Well, the timing here is what's critical for me. I mean, if this happened—if the text was a day before or a week before or if the text was after, I would agree with you wholeheartedly, [counsel], but if they can establish that he made this text within a reasonably short time before the alleged shooting, it's coming in; all right?"

During trial, Detective Jennings testified that GMT is Greenwich Mean Time, which is one hour ahead of Pacific Standard Time (PST) and, therefore, the jury should take into account that the times on the cell phone records were one hour ahead. This testimony was in error, however, and we have taken judicial notice of the fact that PST is seven hours behind GMT, as requested by defendant. This discrepancy was not caught at trial and, on appeal, defendant argues the trial court erred in admitting the text messages and his counsel was ineffective in failing to object to Jennings's erroneous testimony.

## B. Standard of Review

"[A] trial court is authorized to admit only relevant evidence, that is, evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citations.] A trial court has considerable discretion to exclude even relevant evidence, however, if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citations.] A trial court's rulings in this regard will be upheld on appeal unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 78.)

## C. Relevance

The prosecutor theorized Garcia was shot to retaliate against the Norteños for the drive-by shooting that wounded Alex V. the previous night, and he argued the text messages evidenced premeditation. Defendant contends the text messages are too speculative and, therefore, irrelevant.

15.

In addressing the prosecutor's motion in limine seeking admission of the text messages, the trial court found the texts relevant to the issue of preplanning, or premeditation, because they were sent "within a reasonably short time" before the shooting. The text message exchanges occurred the day after Alex V. was shot and the day of Garcia's shooting. We discuss Detective Jennings's testimonial error in more detail *post*, when we address whether the error was harmless, but it suffices here to observe that whether the text exchanges occurred the evening of the shooting or in the early afternoon before the shooting, the exchanges still occurred during the 24-hour window of time between the two shootings and within 12 hours of Garcia's shooting. We find this to be "within [the] reasonably short time" contemplated by the trial court. As the court noted, texts sent a day before or a week before or a day after Garcia's shooting would have been objectionable and subject to exclusion. Clearly, text messages exchanged either before Alex V. was shot or after Garcia was shot would not have been relevant to show Garcia's shooting was premeditated in retaliation for Alex V.'s shooting.

We find no abuse of discretion in admitting the text messages. Any inferences to be drawn and how much weight to accord were issues for the jury to decide. (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.)

### D. Undue Prejudice

Nor do we find the trial court abused its discretion in admitting the evidence over defendant's objection of prejudice.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) However, "'prejudice'" within the meaning of section 352 "does not mean damage to a party's case that flows from relevant, probative evidence. Rather, it means the tendency of evidence to evoke an

emotional bias against a party because of extraneous factors unrelated to the issues. [Citation.] Thus, evidence is subject to exclusion under Evidence Code section 352 on the basis of prejudice only '"when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]'" (*People v. Cortez* (2016) 63 Cal.4th 101, 128–129; *People v. Scott*, *supra*, 52 Cal.4th at p. 491.)

While the trial court found the text messages arguably "very equivocal," it nonetheless found them relevant given defendant's text message referring to doing "the thing" in the "reasonably short" window between the two shootings. The only discernible prejudice to defendant was the possibility the jury might decide the message evidenced premeditation in Garcia's killing. That is not the emotionally evocative prejudice contemplated by Evidence Code section 352, much less one that "substantially outweighed" the probative value, and we reject defendant's claim the trial court abused its discretion in failing to exclude the text messages as unduly prejudicial. (Evid. Code, § 352; *People v. Cortez*, *supra*, 63 Cal.4th at pp. 128–129.)

### E.     Harmless Error

We took judicial notice of the fact that GMT is seven hours ahead of PST. At trial, Detective Jennings incorrectly testified GMT is one hour ahead of PST and the jury should take that into account when reviewing the messages. This error was not caught by defendant's trial counsel, the prosecutor, or the trial court. During closing argument, the prosecutor asserted text messages were sent by defendant at 7:53 p.m. and 8:06 p.m., and he argued, "So we know that the defendant had been thinking about that thing before 8:06 p.m."

17.

Defendant contends the text messages the trial court and jury thought occurred in the evening actually occurred in the early afternoon. However, the time stamps documented in the cell phone report are immediately followed by the notation "(GMT-7)," and the People contend it appears the times were already adjusted for the seven-hour time difference between PST and GMT. Defendant counters that if true, his counsel rendered ineffective assistance of counsel in failing to challenge the prosecution's expert.

Whether the text messages were exchanged at the times documented in the report or seven hours earlier, they were still exchanged in the relevant window of time between Alex V.'s shooting and Garcia's shooting. We find any error resulting from the trial court's admission of the messages or the testimonial error by Detective Jennings harmless because there is no reasonable probability the jury would have reached a different result in the absence of the error.[15] (*People v. Debose* (2014) 59 Cal.4th 177, 202–203; *People v. Williams* (2008) 167 Cal.App.4th 983, 986, fn. 24.) The prosecutor argued the text messages evidenced premeditation, a theory the jury either rejected entirely or determined was not proven beyond a reasonable doubt given defendant's acquittal on the first degree murder charge. Based on the evidence, which included defendant's confession to firing three shots, including one at Garcia, and his uncontroverted presence at the scene of the shooting, we reject his argument that but for the introduction of the

---

[15]    Defendant acknowledges California's reasonable probability test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) usually applies, but argues the federal constitutional standard in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) applies here because "cumulative error rendered [his] trial fundamentally unfair." We reject this argument because we find no errors that, individually or cumulatively, deprived defendant of a fair trial (*People v. Davis* (2005) 36 Cal.4th 510, 573; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 128; *People v. Hunt* (2011) 196 Cal.App.4th 811, 817–818), but we note any error is nevertheless also harmless under *Chapman*, which requires the court "be able to declare a belief that it was harmless beyond a reasonable doubt" (*Chapman*, *supra*, at p. 24).

text messages, "it is reasonably likely one or more jurors would have had a reasonable doubt of [his] guilt."**16**

## III.    Instructional Error

Finally, defendant challenges the trial court's decision to give CALCRIM No. 361, which applies when a testifying defendant fails to explain or deny adverse evidence. (*People v. Cortez*, *supra*, 63 Cal.4th at p. 110; *People v. Saddler* (1979) 24 Cal.3d 671, 677.)  Defendant contends the trial court gave the instruction because it found his testimony lacking in credibility, which violated his right to due process by intruding into the jury's duty.  Further, he contends the error was prejudicial because his testimony was crucial to his defense and the instruction weakened that defense by permitting the jury to question his credibility.  The People respond there is no constitutional violation if the instruction is supported by evidence, and defendant's explanation of his actions was implausible, which can provide a proper basis for the instruction under some circumstances.  The People also contend any error was harmless because other jury instructions cured the error and the evidence against defendant was strong.

### A.    Trial Court's Ruling

Prior to instructing the jury, the trial court discussed the propriety of CALCRIM No. 361 with the parties as follows:

> "THE COURT:  All right.  Three questions—three issues are of concern to me as to the jury instructions.
>
> "Number one, [CALCRIM NO.] 361, failure to explain or deny adverse testimony, if the defendant failed in his testimony to explain or deny evidence against him, and I'm thinking this instruction should be given.

---

**16**    Given our finding of harmless error, we need not reach the People's argument defendant forfeited his challenge to Detective Jennings's erroneous testimony or defendant's claim his counsel was ineffective in failing to recognize the error and object to it.

"To me, [defendant's] testimony was inherently unbelievable. That's just my perception. You should be lucky that I'm not on the jury on this matter, but I'm tempted to give this instruction based upon my feeling about his testimony.

"[DEFENSE COUNSEL]: What specifically did he deny or didn't explain? He explained—he explained everything, your Honor.

"THE COURT: Now, I take a different take. I don't think he explained much of anything.

"[DEFENSE COUNSEL]: Okay. Well, I object for the record of that instruction being given.

"THE COURT: What's your take on it?

"[PROSECUTOR]: I agree with the court, your Honor. There are too many inconsistencies with his testimony, and I think that some things that were contradicted that really shouldn't have been, that should have been just preliminary type information.

"THE COURT: Let me give you an example.

"[DEFENSE COUNSEL]: Please.

"THE COURT: His example of running out in the field and opening up his cell phone so the officers could find him is ridiculous in my opinion.

"[DEFENSE COUNSEL]: That was testified by Officer Navo.

"THE COURT: He testified that he ran full speed trying to catch him.

"The clear input was he was calling his homies to get rid of the gun. That's the clear evidence to me.

"His testimony was he went out there 15 feet into the field and stopped, held up his phone so they could see him 'cause he had dark clothing on him? Who in the world could believe that in my opinion.

"[DEFENSE COUNSEL]: There's no evidence he made a phone call, though.

"THE COURT: Why else would he have his phone out. It certainly wasn't to highlight so the officers could come get him.

20.

"[DEFENSE COUNSEL]: They examined him. There's no evidence of any phone calls. That's a bad instruction, and I object.

"[PROSECUTOR]: Hard to do so when you're running full speed.

"THE COURT: So I intend to give [CALCRIM NO.] 361.

"Now, back to you, Mr.—and again, if, if the jury finds that he failed to deny or explain it, doesn't say that he did. Again, the jury's the fact-finding body, and they can make that—they can make that finding."

The trial court subsequently read the following instruction to the jury:

"If a defendant failed in his testimony to explain or deny evidence against him and if he could reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove a defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meanings and importance of that failure."

## B.    Implausibility as Basis for Instruction

We review defendant's instructional challenge de novo. (*People v. Vega* (2015) 236 Cal.App.4th 484, 495; *People v. Riley* (2010) 185 Cal.App.4th 754, 767.)

In *People v. Saddler*, the California Supreme Court addressed CALJIC No. 2.62, an instruction substantially similar to CALCRIM No. 361. (*People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066.) The court rejected the defendant's challenges to the propriety of the instruction itself on constitutional and other grounds, finding the instruction "suffers no constitutional or other infirmity and may be given in an appropriate case." (*People v. Saddler*, *supra*, 24 Cal.3d at p. 681.) The court then considered the propriety of the instruction in the defendant's specific case and, noting that "a contradiction is not a failure to explain or deny," held "[s]ince there were no facts or evidence in the People's case which [the] defendant failed to explain that were in his particular knowledge to explain, we conclude that there was no support in the record for an instruction on drawing of adverse inferences from a failure to explain or deny." (*Id.* at

21.

pp. 682–683.)  The court concluded, however, that the instructional error was harmless under *Watson*, *supra*, 46 Cal.2d at page 836.  (*People v. Saddler*, *supra*, at pp. 683–684.)

Recently, the California Supreme Court revisited CALCRIM No. 361 to clarify an "apparent inconsistency in the case law" regarding the circumstances in which it is proper.  (*People v. Cortez*, *supra*, 63 Cal.4th at p. 113.)  The court held that it "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge."  (*Id.* at p. 117.)  Testimony that "conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre … is not … 'the functional equivalent of no explanation at all.'"  (*Ibid.*)

In this case, the trial court focused on the plausibility of defendant's explanations and descriptions of events, and that remains the focus on appeal.  While some of defendant's explanations may have strained credibility, the trial court did not identify any examples where he failed to explain or deny adverse evidence and the People point to none in the record on appeal, the burden of which rests with them.  (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1446–1447, fn. 9.)  At trial, defendant admitted to being present when Garcia was shot, denied he had a gun or fired any shots, and characterized the admissions he made during interrogation as lies he told so he could go home.  While defendant's conflicting and/or unbelievable testimony impacts his credibility as a witness, it presents no basis for instructing the jury on the failure to explain or deny adverse evidence.  (*People v. Cortez*, *supra*, 63 Cal.4th at p. 118.)  However, any error was harmless.[17]  (*People v. Saddler*, *supra*, 24 Cal.3d at pp. 683–684.)

---

[17]     The decision in *People v. Cortez*, *supra*, 63 Cal.4th 101, was issued after briefing was completed in this case.  While we assume the decision applies retroactively (*People v. Guerra* (1984) 37 Cal.3d 385, 399; *Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 36–37), we do not decide that issue because we find the error was harmless in any event (*People v. Diaz* (2015) 60

## C. Harmless Error

We review the error under *Watson*, *supra*, 46 Cal.2d 818. (*People v. Saddler*, *supra*, 24 Cal.3d at p. 683; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471–1472; *People v. Marsh* (1985) 175 Cal.App.3d 987, 994.) As previously discussed, we reject defendant's argument that *Chapman* applies due to cumulative error, but again note the error would be harmless under either standard. (*People v. Vega*, *supra*, 236 Cal.App.4th at p. 501.) In addition to confessing to the crime, defendant was present during the commission of the crime; he was a gang member dressed that evening in gang attire; he went to the residential neighborhood where the drive-by shooting occurred the night before specifically to check on the welfare of the victim, a fellow gang member; after finding the victim not home, he went next door where the shooting had occurred and hung out there with other gang members; and prior to leaving the residence before Garcia's shooting, he knew Espindola and the others wanted him to go with them to find a "Northerner." Shortly after leaving the residence, they crossed paths with a "Northerner," who was then shot to death. After the shooting, defendant ran back to the same residence with Espindola. When police arrived, he jumped the fence and began to run away at full speed before being surrounded and apprehended.

Moreover, other instructions "may be considered in assessing the prejudicial effect of an improper instruction." (*People v. Saddler*, *supra*, 24 Cal.3d at p. 684; *People v. Vega*, *supra*, 236 Cal.App.4th at p. 502.) First, CALCRIM No. 361 by its terms leaves it for the jury to determine *if* the defendant failed to explain or deny adverse evidence and *if* he could reasonably have been expected to do so. (*People v. Vega*, *supra*, at pp. 502–503.) The instruction also restates the People's burden of proving the defendant's guilt beyond a reasonable doubt, and leaves the meaning and importance of any failure to

---

Cal.4th 1176, 1195; *Correa v. Superior Court* (2002) 27 Cal.4th 444, 463, fn. 5), and the parties were therefore not invited to submit supplemental briefing (Gov. Code, § 68081).

explain or deny for the jury to determine.  (*Ibid.*)  The trial court also instructed the jury on assessing the credibility of witnesses and, pursuant to CALCRIM No. 200, informed the jury that some of the instructions read may not apply.  (*People v. Saddler*, *supra*, at p. 684; *People v. Vega*, *supra*, at p. 503; *People v. Lamer*, *supra*, 110 Cal.App.4th at p. 1473 [addressing CALJIC No. 17.31, which is substantially similar to CALCRIM No. 200].)

Based on the strong evidence of defendant's guilt and the jury instructions as a whole, we conclude there is no reasonable probability the jury would have reached a different result in the absence of being instructed on CALCRIM No. 361.  Any error "was [also] harmless beyond a reasonable doubt."  (*Chapman*, 386 U.S. at p. 24.)

## DISPOSITION

The judgment is affirmed.


_____
KANE, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
DETJEN, J.

24.